STATE of Missouri, Respondent,

v.

Theodore F. LEWIS, Jr., Appellant.

No. 51749.

Missouri Court of Appeals,
Eastern District,
Division Four.

June 9, 1987.

Motion for Rehearing and/or Transfer
Denied July 9, 1987.

Application to Transfer Denied
Sept. 15, 1987.

will find him guilty. If you are not so convinced, you must give him the benefit of the doubt and find him not guilty."

William L. Webster, Atty. Gen., Jeffrey Philip Dix, Asst. Atty. Gen., Jefferson City, for respondent.

Peter N. Sterling, Public Defender, Rolla, for appellant.

SIMON, Judge.

Defendant, Theodore F. Lewis, Jr., was found guilty of capital murder (§ 565.001, RSMo 1978) (All further references shall be RSMo 1978 unless otherwise noted) in a court tried case, and sentenced to life imprisonment without possibility of parole for fifty (50) years.

On appeal, Lewis claims the trial court erred in: (1) overruling his motion to suppress statements made by him while in custody, and his trial objections concerning their admission because the state failed to prove by a preponderance of the evidence that he initiated further conversation with the police after requesting assistance of counsel and because such statements were involuntary as a result of ineffective assistance of counsel; and (2) finding him guilty of capital murder because the evidence was insufficient to prove premeditation and deliberation. We affirm.

The evidence adduced at trial, briefly summarized, shows that on August 12, 1982, Theodore F. Lewis, Jr. initiated his previously designed plan to rob Cecil Halbert. Lewis worked with Cecil at the "Fishermen's Dude Ranch," a trout lake and hatchery, and knew that Cecil was responsible for the money generated by the pay lake. The Halbert house is approximately one-fourth of a mile away from the "Dude Ranch." Hoping that Cecil would be home for lunch with receipts from the "Dude Ranch," Lewis drove to the Halberts on the morning of August 12. In preparation for the robbery, Lewis obtained a shotgun, numchucks (a martial arts weapon made from two pieces of wood connected by a chain), ski mask, bailing twine, and an extra change of clothing. He brought these items with him to the Hal-

bert residence. He also prepared to leave the area after the robbery by packing a sleeping bag and other personal items.

At approximately 10:30 a.m., Lewis knocked on the Halbert front door. Lola Halbert, the eighty-three year old victim and mother of Cecil Halbert, answered the door. Lewis identified himself by name and asked if he could use the telephone; he was not wearing the ski mask. He had decided to leave it in his car. After Lewis was inside, he struck Lola Halbert in the head with the numchucks, knocking her to the floor. She started screaming and crying out for Cecil. Cecil, however, was at work. To silence her, Lewis struck her two more times with the numchucks while she was on the floor. However, the victim persisted in her pleas and cries for help, so Lewis kicked her in the face and stuffed a rag into her mouth. At this point Lola was unconscious, but Lewis did not leave. He went outside to make sure that no one had heard the screams, came back into the house and began searching for valuables. Unfortunately, after 15 minutes or so, the victim woke up and started crying for help again. Lewis returned to his victim and tried to tie her up with a cord. Having no success, Lewis then tried to strangle her with the cord. Worried about the continued screaming by the victim, Lewis went outside again to see if anyone had heard the noise. Seeing no one, Lewis went back in the house and saw the victim squirming, trying to get up. He stabbed her with a meat fork and then stabbed her in the chest with a pair of scissors, but she still did not die. Lewis went outside again and found a hatchet. He came back in the house, went over to the victim, and struck her in the neck with the hatchet, ending her life.

Lewis testified at trial to all of the aforementioned events. He testified that all of his actions were intended to get the victim to be quiet, either by frightening her or rendering her unconscious. Lewis testified that he did not intend to kill Lola Halbert. Lewis did testify, however, that he had taken the numchucks to the Halbert residence, intending to use them. He testified that he knew that they could kill. Lewis stated that he had taken the change of clothing with him because he knew that the clothes that he was wearing would get blood on them. Lewis testified that he intended to stab the victim with the scissors in order to scare her. He also testified that he intended to hit her with the hatchet.

Lewis testified that he delivered that hatchet blow at 11:15 a.m. He stated he knew this because he went to look at a clock in the house to make sure it was not noon. He testified that he was afraid Cecil would be coming home for lunch and he did not want to be there at that time because he did not have his gun with him. Lewis testified that he had left his shotgun leaning on a fence while walking from his car to the Halbert house.

After striking his victim with the hatchet, Lewis resumed his search for things to steal. He found an antique shotgun and a flashlight that he placed by the door so he would not forget them when he left. He called Cecil at work to ask him if he had any money, but he was told no, so he decided to leave. Before leaving, however, Lewis testified that he wrote a note to throw off the police and placed it on Lola's chest. The note read: "I am staying around town until the time is right to kill again. /s/ The Chinaman."

As Lewis was fleeing the scene, his car ran out of gas. At this time Lewis changed his blood stained clothes and threw them, along with the shotgun and flashlight he had taken from the Halbert home into the woods near his stalled car. He had hidden the instruments used to kill Lola Halbert in or nearby outside of the Halbert home.

At approximately 12:05 p.m., Sheriff John Giles received a call to investigate an occurrence at the Halbert residence. Giles testified that at this time he was not exactly sure what had happened. While en route, Giles saw Lewis standing next to his car on Highway BB. Giles stopped and asked Lewis if he was having trouble. Lewis told him that he was out of gas. Giles offered to take Lewis to the "Dude

Ranch" so that he could get some gasoline, since it was on the way to the Halbert home. Giles testified that because he was unsure of what had occurred at the Halberts, he surreptitiously studied Lewis, looking for evidence of blood and peculiar mannerisms. Giles testified that there was nothing unusual about the way Lewis acted and, based on his twenty-two years in law enforcement, it did not appear that Lewis was under the influence of drugs or alcohol.

Giles dropped Lewis off at the "Dude Ranch" and continued on to the Halbert residence. Ben Redman, an employee at the "Dude Ranch," was there when Lewis arrived. Redman testified that Lewis got there just as he was instructing the ambulance driver how to get to the Halberts. Redman testified that Lewis ran up and asked him "What happened? Did somebody get hurt or what?" Redman told Lewis that he did not know and went in to call Cecil. Cecil told Redman that his mother had been murdered and Redman told him that he would be right over. Redman testified that both Lewis and himself went over to the Halbert house and that they sat with Cecil making "small talk" trying to console him. After Redman and Lewis left the Halbert house, Lewis asked Redman for some gas. Redman got Lewis a gallon of gas and took him to his car.

Lewis then fled the state, stealing gas on his way to Arkansas. The next morning, August 13, Lewis was arrested by Arkansas authorities in connection with the shooting of a Newport, Arkansas police officer. Lewis was arrested by Arkansas State Police Officer Max Jones. Jones handcuffed Lewis, put him in his patrol car, and took him to the Newport City Hall, in which the police station was housed. Jones told Lewis several times that he was not going to ask him any questions and, therefore, did not read Lewis his *Miranda* rights. Jones testified that he never questioned Lewis, but that Lewis voluntarily initiated a conversation by asking if the police officer he had shot was dead. Jones testified that at that time he did not know that Lewis was wanted in Missouri.

Lewis arrived at the Newport City Hall at approximately 10:30 a.m. for booking. A crowd of about 15 or 20 people were in front of the City Hall, but Lewis was taken in through a side entrance. Officer Jones testified that he recognized the persons congregated in front of the building as those who normally transacted business there. As court did not convene until 1:30 p.m., the Arkansas authorities proceeded to question Lewis prior to taking him before the municipal judge for arraignment. Officer Gary Wilson and Detective Larry Cook of the Newport Police Department first questioned Lewis. Before the questioning began, a deputy prosecutor not assigned to the case but curious, walked over to Lewis, who had his head down. The deputy prosecutor, according to the testimony of Officer Wilson, said, "I just want to look at the person who shot the officer." With that, according to Wilson, the deputy prosecutor put his hand on Lewis' head and "just sort of gently pushed his head up." The prosecutor then left and the questioning proceeded.

Officer Wilson testified that he discussed both, the shooting of the Arkansas Officer and the incident that occurred in Missouri, with Lewis. Wilson testified that he advised Lewis of his *Miranda* rights prior to beginning the discussion, but that Lewis began to talk before he got through the entire *Miranda* warning. Wilson testified that he made Lewis stop and completed advising him of his rights. Wilson stated that Lewis was advised two more times of his rights during that period of questioning, including prior to recording his statement. Wilson testified that no threats or promises were made to Lewis and that Lewis was asked if he understood each of his rights and Lewis so indicated. At no time did Lewis request counsel or ask that the questioning be stopped.

State's Exhibit 26, the recorded statement that Wilson took from Lewis, was introduced at trial. However, since no one testified as to its contents at trial and Lewis did not include it in the legal file, we are not aware of its contents. In any event, Wilson testified that the statement was typed, presented to Lewis for inspection,

and he was told to correct any inaccuracies. He made one correction, changing "Cecil's" name to "Halbert" and then he signed each page after being told to do so only if he concurred with what was contained therein. Within a couple of hours after giving this statement, Lewis was taken before an Arkansas magistrate and an Arkansas attorney was appointed to represent him.

At approximately 6:30 p.m. that same day, Missouri authorities arrived to question Lewis about the murder of Lola Halbert. Lewis gave a written and a tape recorded statement (which was transcribed) to these authorities. Again, neither the written nor tape recorded statement (or transcript thereof) have been provided for us in the legal file. Sheriff John Giles took Lewis' written statement. Giles testified that he advised Lewis of his *Miranda* rights before he began talking with him. Lewis was asked if he understood his rights and indicated that he did. Lewis then signed a waiver of rights form that Giles presented to him. Giles testified that Lewis completed, in his presence, a statement in his own handwriting about what had happened in Missouri. Giles testified that at no time did Lewis request an attorney.

Apparently, Lewis' appointed Arkansas counsel arrived at the City Hall after Giles had taken Lewis' written statement. His counsel requested to be permitted to speak to Lewis immediately prior to Lewis giving his taped statement. This request was complied with and Lewis and his counsel conferred for about 40 minutes. Missouri State Highway Patrolman Paul Mertens testified that none of the Missouri authorities were aware that Lewis had counsel at the time he gave his written statement and that the first time they became aware of the fact was immediately prior to the taped statement when the attorney asked to see Lewis.

Patrolman Mertens testified that after Lewis finished speaking with his attorney, he proceeded to take Lewis' taped statement. Mertens stated that, as he remembered, Lewis' attorney only requested that the Missouri officers not discuss the Arkansas case with Mr. Lewis and did not try to stop them from questioning him about the Missouri case. As to what counsel advised Lewis to do in regard to the Missouri case, we are unaware. Lewis did not testify to his conversation with counsel and the record does not indicate what was said.

Mertens testified that when Lewis returned after consulting with his counsel, he asked Lewis if he wanted to continue and Lewis said, "yes." Mertens testified that he again outlined for Lewis his rights under *Miranda*, indicating his right to have an attorney present, and Lewis stated that he did not want an attorney. It was then that the taped confession was made.

At trial, Lewis testified that the written statement given to Sheriff Giles and the taped statement given to Patrolman Mertens were true and accurate. He testified further that he had not been threatened or coerced into giving any statement and that he had not been denied anything that he requested. He stated that he had not asked for an attorney before his written statement to Giles and that he did not object to talking about the Missouri incident after he had conferred with his Arkansas counsel. Lewis testified that he had made the statements because he wanted to tell what had happened and because he wanted to get out of Arkansas and back to Missouri.

Prior to trial, Lewis waived his right to a jury trial and, in exchange, the prosecutor did not seek the death penalty. Defense counsel filed a pre-trial notice of his intention to rely on the defense of mental disease and, thereafter, a motion for a psychiatric examination to determine Lewis' capacity to stand trial, and whether, at the time of the offense, Lewis could appreciate the nature of his conduct or conform his conduct to the requirements of law. The motion was granted and a psychiatric examination was ordered. Doctor S.D. Porwatiker conducted the examination and found that Lewis understood the charges against him and could assist his attorney in his defense. Doctor Parwatiker also found that at the time of the offense, Lewis knew and appreciated the nature, quality, and wrongfulness of the offense and was capa-

ble of conforming his conduct to the requirements of law.

In his first point Lewis contends that the trial court erred in overruling his motion to suppress, and trial objections to, the admission of his recorded statements. Lewis argues that the state failed to prove that he initiated further communication with the Missouri authorities "after expressing a desire for assistance of counsel." Lewis also argues that the trial court erred in these rulings because the statements were involuntary because of his counsel's failure to prevent interrogation by the Missouri authorities.

Addressing Lewis' first argument, we note initially that he does not claim trial error in the admission of his statement given to Arkansas Police Officer Max Jones. Further, the record does not indicate that Lewis ever requested counsel prior to, during, or after the Missouri authorities had interrogated him. We recognize the principle, cited by Lewis, contained in *State v. Oldham*, 618 S.W.2d 647 (Mo. banc 1981), i.e., if accused requests counsel, further questioning can be had only if accused voluntarily, knowingly, and intelligently initiates the communication. This principle applies if the accused has requested counsel.

■ Lewis asserts that he "obviously had requested counsel as one had been appointed by the Arkansas court prior to interrogation by Missouri officials." The record does not indicate this. Lewis did not testify that he had requested counsel. Indeed, Lewis did not testify about the statements. Under Arkansas law, one need not request counsel in order for the court to appoint one. *See, Sutton v. State*, 559 S.W.2d 16, 17 (Ark. banc 1978) (citing Rule 8.2 of the Rules of Criminal Procedure). In the absence of evidence in the record, we will not presume the request.

■ The record indicates that Lewis' rights were adequately protected by the interrogation procedure. The Missouri authorities arrived, and gave Lewis his *Miranda* warning. Lewis stated he understood the warning, including his right to counsel, but nevertheless signed a written waiver of rights. The Missouri authorities were unaware that an Arkansas attorney had been appointed to represent Lewis and at no time did Lewis so indicate. After learning that an attorney had been appointed, Lewis was allowed to confer with counsel for forty minutes. What advice his counsel gave is a matter of conjecture as Lewis did not testify about the conference with his attorney. However, after Lewis returned, he was again read his *Miranda* rights and expressed a willingness to continue with the questioning. Lewis testified at trial that he had not asked for an attorney before conferring with his counsel and that he did not object to talking with the Missouri authorities afterwards. He testified that he made the statements because he had wanted to and that he was not threatened or coerced in any fashion. Viewing the totality of the circumstances surrounding the questioning by the Missouri authorities, we conclude that the statements given by Lewis were voluntary and that the procedure adequately protected his constitutional rights.

■ Lewis' second argument is that his statement was involuntary because his Arkansas attorney did not "prevent further interrogation by Missouri authorities by invoking [Lewis'] Fifth Amendment privilege to remain silent." Lewis claims that his counsel was ineffective for this reason. Because of the lack of an adequate record, we are unable to decide the point. As noted, Lewis did not testify as to what advice his attorney gave to him during their forty minute conference. Counsel may well have advised Lewis to remain silent. The record does not indicate what transpired and, therefore, we cannot conclude that counsel was ineffective or that Lewis' statement was involuntary.

■ In his final point, Lewis contends the trial judge erred in finding him guilty of capital murder because the evidence was insufficient to prove premeditation and deliberation. In *State v. Lieberknecht*, 608 S.W.2d 93, 99 (Mo.App.1980), our Court stated:

'Premeditation means thought of beforehand for any length of time, however short.' [citations omitted] This simply means the defendant thought about what he was about to do before he did it.

*State v. Marston*, 479 S.W.2d 481, 484[6] (Mo.1972). Deliberation occurs when the defendant considers the matter of taking another's life in a 'cool state of the blood,' or with a 'cool and deliberate state of mind.' *State v. Marston*, Id. at 484[4]. Premeditation and deliberation may be established by the circumstances surrounding the incident. *Id.* at 99.

 Reviewing the evidence and its reasonable inferences, we find the following: Lola Halbert, the eighty-three year old mother of the intended robbery victim, was struck in the head, kicked, tied up, strangled, stabbed with a meat fork, stabbed with scissors and struck in the neck with a hatchet. Lewis performed these heinous acts over the course of an hour and one-half.

Further, prior to his arrival at the Halbert residence, Lewis planned to rob Cecil Halbert. He took numchucks, a shotgun with shells, and an extra change of clothes with him. He testified that he intended to use the numchucks and that they could kill. He also stated that he would have used the shotgun if he had to and that he knew that a loaded shotgun could kill. Lewis testified further that he intended to perform all of the violent acts at the time he did them; to kick, choke, stab, and strike with a hatchet. Further, there is no indication of any type of struggle, and the fatal beating was inflicted at a time when the victim was alone. From the seriousness of this beating being inflicted on an eighty-three year old woman Lewis was practically certain to cause the death of Lola Halbert. There are no questions about Lewis' mental capacity. The psychiatric examination of Lewis concluded that "at the time of the alleged offense, he knew and appreciated the nature, quality and wrongfulness of the alleged offense and was capable of conforming his conduct to the requirements of the law." Lewis' contention as to premeditation is without merit.

 Lewis also argues that he is not guilty of capital murder, but is guilty of second degree murder. The difference between capital murder and second degree murder is deliberation. Lewis contends the

evidence at trial failed to show deliberation and that he did not intend to kill, needed money, had taken drugs, and was upset by the breakup between him and his girlfriend. However, the evidence shows otherwise. Lewis attacked the victim numerous times. After each attack, he went outside to make sure that no one had heard the victim's screams. At one point the victim was unconscious for approximately 15 minutes, but instead of leaving, Lewis remained at the Halbert residence. Lewis was calm and cool enough to know that Cecil Halbert would be coming home for lunch soon and that he needed to leave the house before noon. He was also calm and cool enough to search for gas for his car, take the shotgun and flashlight and attach a note to the victim's body to cast suspicion on a fictitious Chinaman. These are the acts of a deliberating individual. The evidence clearly and substantially supports the finding of deliberation. Lewis' point is without merit.

Judgment affirmed.

GARY M. GAERTNER, P.J., and STEPHAN, J., concur.