**STATE of Missouri,
Plaintiff–Respondent,**

v.

**Lynda R. BRANCH,
Defendant–Appellant.**

No. 52614.

Missouri Court of Appeals,
Eastern District.

March 29, 1988.

Motion for Rehearing and/or Transfer to Supreme Court Denied April 27, 1988.

Case Transferred to Supreme Court
June 14, 1988.

Case Retransferred to Court of Appeals
Oct. 18, 1988.

Original Opinion Reinstated
Oct. 19, 1988.

Cyril M. Hendricks, Jefferson City, for defendant-appellant.

William L. Webster, Atty. Gen., Deborah L. Ground, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

SMITH, Judge.

Defendant appeals from her conviction of first degree murder and the resultant sentence of life imprisonment without possibility of parole for fifty years. We reverse and remand.

The victim of the killing was defendant's husband. On May 17, 1986, a call was received on the 911 line to dispatch an ambulance to the Branch residence in Jefferson City. The call was received at 12:30 a.m. Within five minutes police and an ambulance arrived at the address. Defendant told those responding to the call that her husband "has been shot—help him." The husband was found lying in the foyer of the residence covered with a blanket and sheet. The ambulance crew testified that based upon their experience and their examination the victim had been dead at least twenty minutes when they arrived. The assistant medical examiner, a physician, arrived at the scene within fifteen minutes of the initial call and determined death to have occurred prior to 12 midnight.

Defendant advised police at the scene that her husband was alive when she placed the 911 call. She further stated that he had gone to answer the front door while she was dozing; that he returned upstairs saying "help me, it hurts" and then fell down the stairs. She then tried to assist him in various ways and while he was still alive placed the call. All questioning of the defendant at the scene occurred while she was still viewed as a victim and not as a suspect. After the police arrived, defendant was very upset even "hysterical." She was not arrested, but was taken to the police station with her consent while police processed the crime scene. This was done after request to her for permission to do so and upon her statement "go ahead and do whatever you need to do in the apartment."

While defendant was at the police station considerable evidence was collected at the scene. That evidence indicated that the victim was shot in the bedroom in the upstairs of the apartment. His body was then dragged down the stairs. A .22 caliber semi-automatic pistol was found on the lawn near the front porch. This was estab-

lished to be the murder weapon. The victim was shot twice, one bullet piercing the myocardial sac and lung resulting in death. That bullet exited the body and was fired at close range. Medical evidence established that death would not have occurred for several minutes, the time required for the lung to fill with blood. There was relatively little external bleeding. The decedent's blood alcohol content was .16%. The only person present in the house at the time of the shooting besides defendant and the victim was defendant's 14 year old daughter, Tammy, who was asleep in her room.

There was considerable evidence which would warrant the conclusion that defendant dragged the victim down the stairs, attempted to clean her bloody clothes, put new sheets on the bed, and attempted to conceal a sheet which had been wrapped around the gun and through which the bullets were fired. At 3 a.m. the officer in charge of the investigation returned to the police station and administered *Miranda* warnings to defendant. She agreed to answer further questions. At 5 a.m. she was placed under arrest and upon her request for an attorney questioning ceased.

At trial defendant admitted that her original story was fabricated. She testified that she had argued with her husband throughout the day and evening and that he was drinking beer throughout that period. Their argument concerned, among other things, his persistent heavy drinking and included her advice to him that she was leaving him. Defendant testified that she went to sleep on the living room couch but was awakened by her husband who ordered her into the bedroom "where she belonged." She went into the bedroom and was dozing in the bed when she awakened to see her husband pointing a gun wrapped in a sheet at her. Husband stated that he "was going to do to her what he should have done to Pam"—his ex-wife. He also stated in reference to Tammy: "I'll take care of her too." Defendant interpreted that as a threat against Tammy over whom

the couple had also quarreled that day. A struggle ensued over the gun and it discharged inflicting the fatal wound. The gun discharged a second time when defendant attempted to remove the sheet covering it. Defendant stated that she was stunned at what had happened. Her testimony reflected that her husband left the bedroom after being shot and then collapsed and slid down the stairs. She gave a variety of explanations for her subsequent conduct, the thrust of which was she was trying to help him and to cover up what happened to protect him and herself. She testified that when she called 911 she believed her husband was still alive.

There was evidence offered by both the state and defendant that on the day of the killing defendant had paid the balance due on her husband's union initiation fee from his paycheck. At that time she inquired about whether his union medical insurance was in effect because of surgery she was contemplating. She was advised that neither his medical nor $11,000 life insurance policy would be in effect for another six weeks.[1]

Defendant testified to physical and verbal abuse she had sustained from husband when he was intoxicated. She testified to a continuing pattern of such abuse. The trial court imposed a limit on such evidence to that occurring subsequent to 1979.

In rebuttal the state offered three character witnesses who testified to defendant's bad reputation for truthfulness and veracity.

■ Defendant challenges the sufficiency of the evidence to establish the crime of first degree murder notably the sufficiency of the evidence to support a finding of deliberation. We review the evidence in the light most favorable to the prosecution. *State v. Wood,* 596 S.W.2d 394 (Mo. banc 1980) [7–10]. In determining the sufficiency we examine the evidence and circumstances surrounding the act and the reasonable inferences to be drawn therefrom.

---

1. After husband's death the employer discovered it had made an error in reporting the date of husband's employment and in fact he had both medical and life coverage at the time of his death. The only evidence is that on May 16 defendant believed no coverage was in effect.

*Id.* The evidence and inferences here allow the conclusions that the weapon was taken from a closet, that the victim was shot twice at close range, that his body was dragged by defendant down the stairs, that she attempted to conceal her involvement in the crime, that she attempted to dispose of the weapon outside the house, that she washed her clothes and put new sheets on the bed to conceal blood on the mattress, that she deliberately delayed calling for assistance until after her husband was dead, that she fabricated the story she told police, that victim and defendant had quarreled throughout the day, and that their marital relationship had deteriorated to a point where defendant was intending to leave and had made a list of the personal property and how it was to be divided. This is sufficient to establish that defendant killed her husband after deliberation. *See State v. Dickson,* 691 S.W.2d 334 (Mo. App.1985) [5]; *State v. Hurt,* 668 S.W.2d 206 (Mo.App.1984) [22–23].

Defendant's major challenge is to the rulings of the trial court restricting evidence tendered by her concerning physical abuse to her prior to 1980. Companion evidence of a life-threatening assault against Pam Buford, the victim's ex-wife, was also excluded by the trial court. Defendant was allowed to testify concerning assaults upon her occurring after 1979. This testimony, otherwise undocumented, was that the victim, otherwise a loving husband, regularly became physically abusive when intoxicated. Defendant sought to introduce evidence through hospital records that dealt with her admission to the hospital in April 1978 for contusions and sprains sustained by defendant as a result of a beating by her husband. Specifically the report in pertinent part read:

"*Chief complaint:* Facial injuries from beating.

*Present Illness:* This is a 25 year old, white female who was admitted to the hospital after her husband had beaten her about the face and forehead during a fight immediately prior to the hospital admission. The patient states that the husband had been drinking and landed several blows to her face, one of which hit the left side of the forehead and left periorbital area. This injury caused a large ecchymotic and contused area, apparently from where the husband's hand struck the telephone and the telephone in turn smashed against the side of her head. The patient states that she was unconscious a couple of times on the way to the Emergency Room and she states that she was weak and had blurred vision prior to the admission to the Emergency Room. She, in the Emergency Room, was coherent, but had blurred vision and was unable to count fingers for a certain period of time.... The patient had a large ecchymotic area across the left forehead and because of the visual blurring and inability to count fingers, the patient is admitted to the hospital.... *Past Medical History:* The patient's past medical history is very complicated. She has been beaten several times before by this husband. He apparently has a drinking problem and was told 2½ years ago by Dr. Giffen that if he didn't stop his drinking, that he would have severe diabetes. He has restarted this drinking habit recently and this has produced a hardship on the family....

*Admitting Diagnosis:* 1. Head contusion, right forearm and hand contusion, suspect right middle phalanx proximate interphalangeal joint sprain. 2. Anxiety, acute."

A follow-up report made a final diagnosis of "1. Facial contusion. 2. Hysterical blindness."

The trial court excluded the testimony concerning husband's conduct prior to 1980 on the basis of "remoteness." Generally whether relevant evidence is inadmissible because it is too remote to be material is a matter resting within the discretion of the trial court. *State v. Taylor,* 701 S.W.2d 725 (Mo. banc 1985) [1, 2]. Passage of time alone is insufficient to support an objection of remoteness. *State v. Joiner,* 559 S.W. 2d 226 (Mo.App.1977) [4]. *Mid–American Lines, Inc. v. Littrell,* 653 S.W.2d 391 (Mo. App.1983) [2]. We are unable to conclude that the evidence offered was remote or that it lacked materiality. We are not deal-

ing here with an isolated incident occurring eight years prior to the killing. We are dealing with a continuous pattern of conduct essentially throughout the marriage. Defendant's testimony was that beatings of her by her intoxicated husband occurred throughout the years back to 1980, as far back as she was permitted to testify. *See State v. Hodge,* 655 S.W.2d 738 (Mo.App. 1983) [18, 19]. She did not offer, and probably could not offer, any corroboration of that pattern of abuse. The hospital report in 1978 did furnish corroboration that this was a marriage in which the wife was physically abused when the husband was intoxicated. The state offered evidence that defendant had a reputation for being untrustworthy. In the absence of the 1978 hospital report, defendant had only her word to support her testimony concerning her husband's abusive nature.

The evidence was clearly relevant in three separate areas. The trial court submitted a self-defense instruction. While such a submission was questionable in view of defendant's testimony that the shooting was accidental the trial court believed sufficient evidence existed to submit the issue to the jury. The parties have not briefed, and we do not reach, the sufficiency of the evidence to support that submission. Assuming the issue was properly submitted the defendant's experience with the victim's physical abuse while intoxicated was relevant to the level of apprehension she felt at the time of the shooting and her belief in the need to defend herself.

■ More clearly, the evidence was relevant to her asserted claim that the killing was accidental. At one time it was generally recognized that self-defense and accident are mutually exclusive defenses, at least where the evidence to support each comes from the same witness. *State v. Brown,* 502 S.W.2d 295 (Mo.1973) [1]. This was because self-defense contemplates an intentional but justified act, whereas accident is a non-intentional act making it excusable. MAI–CR3d 304.11 D, however, now views accident as a fact in negation of essential elements of the crimes of assault or homicide. It would appear that the two

concepts are no longer mutually exclusive as one is a defense and the other relates solely to the sufficiency of the state's proof and is before the jury when injected into the case by the defendant. Sec. 563.070 RSMo 1986. The jury is therefore required to evaluate defendant's testimony that the shooting was accidental as a question of whether the state carried its burden that the shooting was intentional. Credence in the testimony of defendant must originate from a belief that the victim became abusive when intoxicated. That he was intoxicated at the time of the shooting was established by the chemical tests on his blood. The hospital report of the 1978 beating served to establish the essential base for the defendant's theory of accident.

Further the evidence was relevant to the degree of homicide the jury could find if it rejected self-defense and accident. That defendant may have intentionally shot her husband while he was in an abusive intoxicated condition could well have caused a jury to reject deliberation and even premeditation and allowed a conviction of either second degree murder or manslaughter. The state's theory was that the victim was asleep on the bed and that defendant shot him as he laid there. The weakness with this position was that the fatal bullet exited the victim's back at high velocity and was found on the floor. There was no hole in the mattress. The prosecution attempted to explain this through testimony of a police officer that he had known of occasions when a bullet which traveled through a body would hit a piece of fabric and immediately stop. If the jury chose to discount that testimony, then it could well have believed that the victim was awake and not lying on the bed. This would justify an inference that the parties were confronting each other at the time of the shooting. This is supported by the fact that the fatal bullet was fired at close range into the front of the victim. The evidence in this case to establish deliberation was largely defendant's conduct after the fatal shot was fired. Such conduct can support an inference of deliberation before the killing. *State v. Dickson, supra; State v. Hurt, supra.* But that inference is not mandato-

ry. A jury could have concluded that defendant's post-shooting conduct was the product of panic or some other emotion and that her pre-shooting state of mind did not include deliberation. The post-shooting deliberation may have originated in an attempt to cover-up a killing based upon a pre-shooting state of mind less than deliberate. It is defendant's state of mind before the killing, not after, which determines the level of homicide of which she is guilty.

The effect of the court's ruling was to deny to defendant the documentary evidence she needed to establish her contention that the shooting occurred because of her husband's abusive intoxicated conduct immediately preceding the shooting. We find that ruling to have been an abuse of discretion and erroneous resulting in prejudice to the defendant.

We need not explore the question of the admissibility of all of the statements contained in the medical report. In *Breeding v. Dodson Trailer Repair, Inc.,* 679 S.W.2d 281 (Mo. banc 1984) [2], the Supreme Court recognized the principle that statements made to a physician, or contained in hospital records, even if characterized as medical history, are admissible insofar as such statements are reasonably pertinent to diagnosis and treatment. It is certainly arguable that identification of the person rendering the beating or his history of alcoholism is not necessary to treatment of the contusions resulting from the beating. But it is to be noted here that the secondary diagnoses included "anxiety, acute" and "hysterical blindness." Whether the source of the beating and the husband's history are "reasonably pertinent" to these diagnoses can be developed and determined on retrial.

■ We turn to the offered and rejected testimony of the ex-wife. During the state's case it put defendant's daughter on the stand to testify to the explanation of the shooting given by defendant to the daughter two weeks before trial. That explanation was consistent with defendant's testimony at trial. It included the statement allegedly made by the husband that he was going to do to defendant what "he

should have done to Pam." Defendant offered to put Pam Buford on the stand. In an offer of proof, it was stated that Buford would testify that she was previously married to the victim, that in 1972 the victim "accused" Buford, she threatened to leave him and he pulled a shotgun and threatened to kill her. This action resulted in her divorce from Branch. She also was prepared to testify to Branch's change in behavior when he was drinking. In 1976 the defendant talked to Buford about any problems Buford had had with the victim and Buford told her at that time about the shotgun episode. The state objected to testimony of Buford on the basis that it was too remote in time. That objection was sustained. Because of the continuing nature of the victim's alleged physical abuse of his spouse after drinking and the fact that both incidents arose following threats of the wife to separate, we are unable to conclude that remoteness was a justifiable ground for excluding the testimony.

■ The more serious problem is the rule recognized in *State v. Maggitt,* 517 S.W.2d 105 (Mo. banc 1974) [1] that,

"where the defense is self-defense evidence is competent to prove that the deceased bore the reputation of being of a violent and turbulent disposition or character, but that such must be proved by testimony concerning his general reputation and not by evidence of specific acts of violence having no connection with defendant." (Quoting *State v. Duncan,* 467 S.W.2d 866 (Mo.1971) [1, 2].)

*Maggitt* took the *Duncan* decision one step further than *Duncan* had gone in applying the rule. *Duncan* specifically refused to consider the applicability of the rule in situations where the defendant was present or had knowledge of the specific act prior to the homicide because that fact was not present in *Duncan.* In *Maggitt* the defendant did have knowledge of the specific act of violence, but the rule was nevertheless invoked purportedly on the authority of *Duncan.* We are, of course, bound by *Maggitt* whatever our reservations about its correctness. Both *Duncan* and *Maggitt* state that the rule applies to

self-defense cases where the violent and turbulent character of the victim is utilized to establish the reasonableness of defendant's fear of imminent injury or death. We are not convinced that the rule is applicable where, as here, the specific act has relevancy to the level of deliberation or premeditation of the defendant, where the prior assault is necessary for an understanding of the decedent's pre-shooting statement to the defendant, and where the prior act is pertinent in assessing defendant's credibility. While the evidence did relate to the victim's character it also had relevance to the other issues mentioned above. As such we do not find this evidence is governed by the rule set forth in *Duncan* and *Maggitt.* It was error to deny the defendant the opportunity to present this evidence.

We have reviewed defendant's remaining claims of error and find them to be without merit.

Judgment reversed and cause remanded for new trial.

KAROHL, P.J., and KELLY, J., concur.