STATE of Missouri, Respondent,

v.

Charles Q. MOORE, Appellant.

No. WD 53087.

Missouri Court of Appeals,
Western District.

July 22, 1997.

Susan L. Hogan, Appellate Defender, Kansas City, for appellant.

Jeremiah W. (Jay) Nixon, Attorney General, Cathleen A. Martin, Assistant Attorney General, Jefferson City, for respondent.

Before LAURA DENVIR STITH, P.J., and BRECKENRIDGE and HANNA, JJ.

LAURA DENVIR STITH, Presiding Judge.

Appellant Charles Q. Moore appeals his conviction of two counts of first degree murder and two counts of armed criminal action claiming that there was insufficient evidence to convict him because the State failed to prove that he acted with deliberation. Finding the evidence sufficient to support the convictions, we affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In the light most favorable to the verdict, the evidence was as follows. On the night of May 13, 1995, Appellant Charles Moore was at the house where he lived with his aunt, Barbara Miller, and her boyfriend, John Guido. While Ms. Miller was at work, Mr. Moore had been smoking PCP. Later that night in one of the bedrooms, Mr. Moore shot Mr. Guido twice in the back of the head. Mr. Moore then left Mr. Guido's dead body lying across the bed overnight, and the sheets were soaked with blood. When Ms. Miller came home the next afternoon, she found Mr. Guido's dead body and became hysterical. She went to the dining room, where Mr. Moore shot her once in the back of the head. The prosecutor argued the evidence permitted the inference that she was shot while sitting, that she did not die immediately, and that she died either from bleeding or suffocation after Mr. Moore wrapped a throw rug around her head.

To conceal his involvement in the murders, Mr. Moore put both bodies in Ms. Miller's car and drove the car into Troost Lake. He threw the shell casings and bullets into the lake and hid the gun in the rafters of the porch. Mr. Moore also cleaned up some of the blood in the house, removed part of the dining room carpet that was blood-stained, and took the bloody sheets and pillow cases off the bed and hid them in a suitcase in the attic.

On the morning of Monday, May 15, 1995, the Kansas City Fire Department received a report that there was a car in Troost Lake. Fire fighters investigated and discovered a woman's body in the back seat, so they called the underwater rescue team from Lee's Summit. The rescue team recovered two bodies from the car. The bodies were later identified as those of Ms. Miller and Mr. Guido.

Detectives George Barrios and Kent Morton went to Ms. Miller's address, where Mr. Moore answered the door and falsely identified himself as Lamont Miller. The officers told Mr. Moore that they were investigating the reported disappearance of Ms. Miller, and Mr. Moore responded that he did not know where she was. The detectives later returned to the house with a search warrant and were told that the man they had spoken with earlier was, in fact, Mr. Moore. Upon searching the house, police found what appeared to be blood on some clothing, the dining room wall, a plastic runner in the hallway, the back porch steps, and a small throw rug covering a section of carpeting that had been cut out. DNA testing revealed that some of the blood samples obtained were consistent with Ms. Miller's genetic profile.

On May 16, 1995, Mr. Moore voluntarily went to the police station and spoke with Detectives John Thompson and Jay Pruetting. After making a videotaped statement in which he denied any involvement in his aunt's and Mr. Guido's death, Mr. Moore left.

The next day, May 17, 1995, the police brought Mr. Moore back to the police station for further questioning. During this video-

taped interview, Mr. Moore said that his original story was not true. Instead, he told police, he had entered the back door of Ms. Miller's house on the evening of May 14, 1995, and seen a man he identified as Shavel Foy standing between the kitchen and the dining room with a gun. Mr. Moore told the detectives that he then ran and hid, and when he later returned to the house, he found his aunt and Mr. Guido dead. After making this statement, Mr. Moore was arrested on an unrelated offense.

On May 18, 1995, police again went to Ms. Miller's residence with a search warrant. In the attic, they discovered a hidden suitcase containing blood-soaked bed linens. The police also found a spent nine-millimeter shell casing underneath the dining room table. That same day, Mr. Moore was brought back to the homicide unit and made a third videotaped statement. During this interview, Mr. Moore confessed to murdering Ms. Miller and Mr. Guido. He said the murder of Mr. Guido occurred during an argument while he was high on PCP, and that he did not know he shot Ms. Miller, but just heard a bang and then saw the gun in his hand and her bleeding body on the floor.

Approximately one week later, Mr. Moore was indicted for two counts of first degree murder and two counts of armed criminal action. After a trial, the jury convicted Mr. Moore on all counts. This appeal followed.

## II. STANDARD OF REVIEW

In considering whether the evidence was sufficient to support the jury's verdict, the appellate court views the evidence and all reasonable inferences drawn from the evidence in the light most favorable to the verdict and disregards all contrary evidence. Review is limited to a determination of whether there is sufficient evidence from which a reasonable juror might have found the defendant guilty beyond a reasonable doubt. *State v. Grim,* 854 S.W.2d 403, 405 (Mo. banc), *cert. denied,* 510 U.S. 997, 114 S.Ct. 562, 126 L.Ed.2d 462 (1993).

## III. ANALYSIS

Mr. Moore's sole point on appeal is that there was insufficient evidence to convict him of first degree murder because the State did not establish that he acted with deliberation in killing his aunt or in killing Mr. Guido. He claims that the killings did not amount to first degree murder because the killings took place during "emotionally charged circumstances" and thus constituted second degree murder.

■ A person commits the crime of first degree murder by knowingly causing the death of another after deliberation. § 565.020.1, RSMo 1994. Deliberation is defined as "cool reflection for any length of time no matter how brief." § 565.002(3), RSMo 1994. Deliberation may be proved by indirect evidence and may be inferred from the circumstances surrounding the murder. *State v. Santillan,* 948 S.W.2d 574, 575–76 (Mo. banc 1997); *State v. Beishline,* 926 S.W.2d 501, 511 (Mo.App.1996); *State v. Clark,* 913 S.W.2d 399, 404 (Mo.App.1996). In most cases, indirect evidence that supports a finding of deliberation will also support a finding that there was no deliberation, and the existence of deliberation is therefore a question of fact for the jury. *Santillan,* at 576.

■ We believe this to be the situation here. The trial court submitted both first and second degree murder to the jury. We agree that the evidence was sufficient to support a finding of either deliberation or no deliberation as to either or both victims, depending upon which version of the evidence the jury accepted. Accordingly, the case was properly submitted on both theories.

■ More specifically, the defendant's evidence and trial strategy were primarily designed to show that he did not commit the murders at all and that they were instead committed by another. Indeed, all but one page of his closing argument was devoted to the claim of alibi and that Mr. Moore had been framed and his confession given involuntarily. His counsel used the final few minutes of closing argument, however, to argue that even if the jury believed he did commit the murders, as he confessed he had done in his third statement to the police, the evidence only permitted the conclusion that the murders occurred while Mr. Moore was high

on drugs and that he killed the victims on the spur of the moment, and not as a result of deliberation.[1]

The evidence and inferences favoring deliberation were the focus of that argument. Thus, the prosecutor's closing argument first directed the jury to the evidence prior to and during the shootings which supported a finding of deliberation as to Mr. Guido, arguing, without objection:

> Now, John Guido, the circumstances of his death, there is deliberation written all over it. The man was shot twice in the back of his head. Dr. Berkland testified that that gun had to be behind John Guido shooting up at an angle. So what does that tell you? He had his back turned, either running, walking away or he was laying down on the bed.
>
> Common sense will tell you that he was laying down in that bed when this defendant walked up with the gun, stood behind him and shot two rounds in the back of his head. Bullets go through John Guido's head there on the pillow. The shell casings are on the bed. This defendant gathers them up. It makes sense. Gets rid of the shell casings, leaves him there bleeding on the bed. His story is John Guido's coming at him, he shoots him, and he just happens to fall on the bed and lay there for the next day.
>
> The deliberation with John Guido may have been seconds, it may have been minutes, but it was certainly there.

Numerous cases support the prosecutor's argument that shooting Mr. Guido more than once indicates there was time for deliberation between shots. *See, e.g., State v. White,* 790 S.W.2d 467 (Mo.App.1990); *State v. Barnes,* 740 S.W.2d 340, 344 (Mo.App.1987); *State v. Hurt,* 668 S.W.2d 206 (Mo.App.1984).

The prosecutor similarly argued that the physical evidence of what occurred at the time of Barbara Miller's death showed deliberation. In particular, he said, the evidence supported the inference that she was shot from behind while she sat at the dining room table, and that this was inconsistent with the claim that she was shot in a moment of passion or panic. As the prosecutor further noted in his closing argument, the inference of deliberation as to both killings was supported by Mr. Moore's conduct after the shootings. More specifically, Mr. Moore attempted to conceal his involvement in the murders by taking the bodies out of the house, putting them in Ms. Miller's car, and driving the car into Troost Lake. He hid the gun in the porch rafters and threw the shell casings and bullets in the lake. He attempted to clean up the blood around the house and took the bloody sheets and pillowcases off the bed and hid them in a suitcase in the attic. He then lied about his identity and gave one or more false stories to the police.

The Eastern District held on strikingly similar facts in *State v. Branch,* 757 S.W.2d 595 (Mo.App.1988), that it was up to the jury in the face of such evidence to decide whether such actions merely evidence panic following an accidental killing, or instead evidence deliberation and a plan for hiding the crime. In *Branch,* Mrs. Branch claimed that her husband had complained of pain and then fell down the steps. Later, however, she admitted that she had originally lied to the police, and that she had shot her husband accidentally during an argument and a struggle. *Id.* at 597–97. The State's theory was that the defendant had shot the victim while sleeping in bed. The court stated that this supported an inference that the shooting was deliberate. *Id.* at 599. The inference of deliberation was further supported by the defendant's conduct after the shooting attempting to conceal her involvement in the murders. The evidence indicated that the defendant then dragged the body down the stairs, washed her clothes, attempted to dispose of the weapon outside the house, put new sheets on the bed to conceal blood on the mattress, and fabricated the story she told the police. *Id.* at 596–97.

**1.** On appeal, Mr. Moore also implies that we should find that he could not form the requisite mental state of acting deliberately because he had been smoking PCP before the murders. Voluntary intoxication, however, does not prevent a criminal defendant from forming the requisite mental state to commit a crime. *State v. Roberts,* 948 S.W.2d 577, 588 (Mo. banc 1997); *State v. Erwin,* 848 S.W.2d 476, 482 (Mo. banc), *cert. denied,* 510 U.S. 826, 114 S.Ct. 88, 126 L.Ed.2d 56 (1993).

We believe that the inference is even stronger here than in *Branch* that the victims' were killed following deliberation rather than in the heat of panic or an argument, because here the jury could have found that the victims were alive after the shootings, yet Mr. Moore made no attempt to get medical attention for either of the victims. Instead, he left Mr. Guido's body lying in the bed for a day, until Ms. Miller returned home. The Deputy Medical Examiner testified that Mr. Guido's gunshot wounds would not have been immediately fatal, and that Mr. Guido could possibly have been saved if immediate medical attention had been sought. Likewise, Mr. Moore made no attempt to get medical treatment for his aunt, although the evidence supported a finding that she was not immediately killed by the gunshot and instead either suffocated or bled to death after Moore wrapped her head in a throw rug. Such lack of concern for and failure to attempt to aid the victims after they were shot supports an inference of deliberation by Mr. Moore. *See State v. Howard,* 896 S.W.2d 471, 481 (Mo. App.1995); *Barnes,* 740 S.W.2d at 345 (inference of deliberation is strengthened by making false statements to the police); *State v. Mallett,* 732 S.W.2d 527 (Mo. banc), *cert. denied,* 484 U.S. 933, 108 S.Ct. 309, 98 L.Ed.2d 267 (1987) (a finding of deliberation is supported by evidence the defendant allowed an incapacitated victim to die rather than seeking help for the victim).

Finally, in this case, the inference that Mr. Moore acted deliberately was further strengthened by the fact that Mr. Moore tried to place the blame for the murders on someone else by telling the police that he had found a man named Shavel Foy in the house on the day of the murder. *State v. Lewis,* 734 S.W.2d 847, 853 (Mo.App.1987) (affirming conviction for capital murder where after murder defendant attached a note to the body attempting to cast suspicion on a fictitious person).

After hearing all of the evidence and the prosecutor's and defense counsel's arguments about inferences from the evidence, the jury did not accept defense counsel's argument that Mr. Moore did not act with deliberation in killing his aunt and Mr. Guido, or that the killings were the work of Mr. Foy, but instead found that Mr. Moore killed the victims and did so after deliberation. The evidence was sufficient to support the jury's verdicts. Accordingly, we affirm.

All concur.