**STATE ex rel. Shirley LUTE, Petitioner,**

v.

**MISSOURI BOARD OF PROBATION AND PAROLE, et al., Respondents.**

(consolidated with)

**State ex rel. Lynda Ruth Branch, Petitioner,**

v.

**Jennifer Miller, Superintendent, Chillicothe Correctional Center, et al., Respondents.**

Nos. SC 88026, SC 88111.

Supreme Court of Missouri, En Banc.

April 17, 2007.

Jane H. Aiken, Stephen M. Ryals, Olivia J. Bradbury, St. Louis, for Petitioner in SC 88026.

Mary W. Beck, Richard Kroeger, Kelly King, Columbia, for Petitioner in SC 88111.

Jeremiah W. (Jay) Nixon, Atty. Gen., Michael J. Spillane, Asst. Atty. Gen., Jefferson City, for Respondents in SC 88026 and SC 88111.

MARY R. RUSSELL, Judge.

Shirley Lute and Lynda Branch were each convicted of murdering their abusive husbands. After serving many years in prison, each of them petitioned the Governor for clemency. They were among 45 out of 992 petitioners that were granted clemency by Governor Bob Holden in 2004.

His commutations eliminated from Lute's and Branch's sentences the prohibition against probation or parole. The Missouri Board of Probation and Parole ("Board") denied parole to Lute and Branch, stating that granting parole would depreciate the seriousness of the present offense. Both women sought writs of habeas corpus from this Court, which were issued, and the cases were briefed and argued. As habeas corpus is an original remedial writ, this Court has jurisdiction. Mo. Const. art. V, sec. 4. This Court issues writs of mandamus ordering the Board to promptly conduct parole hearings for Lute and Branch in accordance with this opinion.

## I. Facts Relating to Shirley Lute

At 76–years old, Shirley Lute is the oldest female inmate in the Missouri Department of Corrections and has been in prison 29 years. The following history of Lute's abuse was alleged in her clemency petition and considered by the Governor.

Shortly after Shirley Lute met Melvin Lute, he began to physically and mentally abuse her. They married in 1976, and throughout their marriage, he would punch her in the ribs and breasts and jaw, kick her in the stomach, and bite her breasts. He instructed her to never tell anyone about the abuse. He would place her in karate holds and bend each of her fingers back to force her to comply with his sexual demands. He frequently put a dog collar on her and made her bark like a dog. During one incident, he tied her to their bed and choked her and burned her with cigarettes. He was a non-smoker and had purchased the cigarettes solely to torture her. He refused to untie her to let her go to the bathroom and she was forced to urinate on herself. On more than one occasion he locked her in an unheated, rodent-infested basement for days without warm clothing, food, or water. During another incident, he threw her out of his moving truck. Then he went back and chased her down, threw her back into the truck, drove to a secluded location and kicked, punched, and choked her.

Melvin Lute was killed on the night of February 6, 1978, by Roy Welch, Shirley Lute's son.[1] She was arrested and charged with the murder in 1978 and has remained in prison ever since. She has always denied her involvement in the murder. At her trial, the prosecutor claimed that she offered her son money from life insurance proceeds if he killed Melvin Lute. Outside of a single comment made by Shirley Lute about a time when Melvin Lute had hit her and kicked her in the leg, no evidence about her abuse was offered at trial. Missouri's statute permitting the admission of evidence on battered spouse syndrome was not enacted until 1987. She was convicted of first degree murder on June 11, 1981, and sentenced to life in prison without the possibility of parole for 50 years.

On December 28, 2004, Governor Holden commuted Lute's sentence. The commutation stated:

After examination of the application and facts relevant thereto, and upon recommendation of the Board of Probation and Parole, I hereby grant to Shirley Lute a commutation of the above sentence, in the following respect. This commutation eliminates from the sentence the prohibition against eligibility for parole for 50 years, and makes Shirley Lute eligible for parole consideration.

The Board denied Lute parole.[2] Its decision stated the reason for the action tak-

---

1. Roy Welch pled guilty to second-degree murder and received 30 years.

2. The Board did not hold a parole hearing until over five months later, on June 2, 2005,

en as: "Release at this time would depreciate the seriousness of the present offense based upon the following: A. Circumstances surrounding the present offense."

Lute filed this petition for a writ of habeas corpus. At this time, she remains imprisoned at the Chillicothe Correctional Center, where she has been a model prisoner. She asks this Court to order her release so that she may live the remainder of her life with her daughter, son-in-law, and grandchildren in Missouri.

## II. Facts Relating to Lynda Ruth Branch

Lynda Ruth Branch has been imprisoned for over 20 years. The following history of Branch's abuse was alleged in her clemency petition and considered by the Governor.

Raymond Branch brutally beat and tortured Branch throughout the course of their 11-year marriage. The abuse began on their wedding night. Branch, seven-months pregnant at the time, was sitting in a rocking chair. Raymond Branch hit her so hard that the chair was knocked over and she landed on her stomach. She miscarried a week later. The abuse continued and got progressively worse throughout the marriage. He cut her with a knife and the top of a can. He shot at her. He beat her with a telephone receiver when she tried to call for help. He threw her down the stairs. He cracked her ribs, pulled her hair out, and blackened her eyes so badly that she temporarily lost her eyesight. Knowing that she was afraid of small spaces, he locked her in closets and made her beg to be let out. He also handcuffed her and burned her with cigarettes. He forced her to crawl across the floor and to perform sex acts. He slept with his leg over her to make sure she did not leave the bed when he was sleeping, and he marked her tires and mileage to ensure that she did not leave the house when he was gone. He killed her cat and tied it to her car's rearview mirror. The last week of their marriage, he handcuffed her to the kitchen table, ripped off all of her clothes, put a candle in her vagina and lit it, allowing the hot wax to burn her.

Lynda Branch shot Raymond Branch twice the night of May 16, 1986. At trial, she claimed that they had quarreled throughout the day and that Raymond Branch was drinking. She had told him she was leaving him. After she went to sleep on the couch, he woke her up and ordered her to go to the bedroom "where she belonged." Later that night, she awoke to him pointing a gun at her that was wrapped in a sheet. She recognized it as a gun because it was from his truck. She claims that he threatened to kill her and her daughter. After that, a struggle ensued and the gun went off. Raymond Branch was shot. Then, when she took the gun out of the sheet, it went off again. The prosecution claimed that she premeditated the killing and then tried to cover it up by moving his body and changing her clothes and the bed sheets.

Branch's first conviction was reversed because some evidence of the domestic abuse was excluded. *See State v. Branch,*

---

and did not render its decision until August 2, 2005. The Board's regulations state that "[t]he parole board will reach a decision within ten (10) working days from the date of the hearing, or as soon as practicable, and the inmate will receive a written notice of the board's action as soon as the notice can be prepared and delivered." 14 CSR 80– 2.010(8)(A). The Board's decision did not provide an explanation for its delay beyond the time set in its regulations, nor is any explanation offered why it was not practicable to issue its one-sentence order in a more timely fashion. By the time of the hearing, Governor Holden was no longer in office.

757 S.W.2d 595 (Mo.App.1988). She was convicted again on March 3, 1989, of first degree murder and sentenced to life in prison without the possibility of parole for 50 years. *State v. Branch*, 811 S.W.2d 11, 11 (Mo.App.1991). For unexplained reasons, her lawyers in the second trial again did not introduce all of the evidence of the abuse.

Branch petitioned the Governor for clemency and on November 24, 2004, Governor Holden commuted her sentence. His commutation stated:

> After examination of the application and facts relevant thereto, I hereby grant to Lynda Branch a commutation of the above sentence, in the following respect. This commutation eliminates from the sentence the prohibition against probation or parole and makes Lynda Branch eligible for probation or parole consideration.

The Board denied her parole.[3] Its order stated that the reasons taken for the action were: "Release at this time would depreciate the seriousness of the present offense based upon the following: A: Circumstances surrounding the present offense, B: Use of a weapon, C: Use of excessive force or violence."

Branch petitioned this Court for a writ of habeas corpus. She asks that this Court release her from prison. She would like to spend time with her daughter, her grandchildren, and her elderly mother.

### III. Discussion

The issue before this Court is the effect of the Governor's commutations. Lute and Branch argue that the Board's denial of parole was contrary to the intent of the Governor's commutations. The State argues that the commutations are clear upon their face.

▮ The governor is the head of the executive branch. Mo. Const. art. IV, sec. 1. The Missouri Constitution gives the governor the power to commute and pardon criminal convictions. Mo. Const. art. IV, sec. 7. When prisoners petition the governor for clemency, the Board investigates each case and submits a report of its investigation, along with its recommendations, to the governor. Section 217.800, RSMo 2000. The Board must follow the governor's orders as he is granted the sole authority to commute sentences at his discretion.

▮ In interpreting the Governor's commutations, this Court must give effect to the Governor's intent. This is consistent with long-standing precedent holding that the power to grant commutation is "a mere matter of grace" that the governor can exercise "upon such conditions and with such restrictions and limitations as he may think proper." *Ex Parte Reno*, 66 Mo. 266, 269, 273 (1877); *Ex Parte Webbe*, 322 Mo. 859, 30 S.W.2d 612, 615 (banc 1929).

▮ Both of the Governor's commutations here explicitly stated that he made the decision to commute the sentences to make them eligible for parole "[a]fter an examination of the application and facts relevant thereto." While the commutations might not have explicitly stated that the Governor had considered "the seriousness of the present offense," that is neces-

---

**3.** The Board did not give Branch a parole hearing until over six months later, on June 1, 2005, and it did not render its decision until a month later. As in the case of Lute, it is unclear why the parole board did not give Branch a hearing until over six months after the commutation order. It is also unclear why the Board's decision was not made until a month later. Under parole regulations, the decision must be made within 10 working days of the hearing or as soon as practicable. 14 CSR 80–2.010(8)(A).

sarily implied because otherwise the Governor would not have recommended these two women for parole after considering the facts of their cases.[4]

■ Any doubt regarding the intent of the Governor is resolved by his sworn affidavits.[5] In Lute's case, Governor Holden's affidavit stated that:

This denial of her parole by the Board was inconsistent with my clear intent as I had already given detailed consideration of the circumstances surrounding her offense.... In reviewing Ms. Lute's application, I had deemed that her release would not depreciate the seriousness of her offense.... In reviewing Ms. Lute's application, I considered: the circumstances surrounding her offense, the inadequate defense presented in Ms. Lute's trial, the lack of knowledge at the time of Battered Women's Syndrome, the length of time she had spent in prison, her exemplary behavior while incarcerated, her age and health, and the fact that Ms. Lute had served the retributive and deterrent portion of her sentence.

In Branch's case, Governor Holden's affidavit stated that:

In coming to the commutation decision, I reviewed the facts of Lynda Branch's case, including the circumstances surrounding her crime, the abuse she suffered at the hands of her husband, and the fact that she used a weapon to commit her crime.... When determining whether or not Lynda Branch should be released on parole, I did not intend that the Board of Probation and Parole

would reexamine the same factors as I did when granting her clemency.

These affidavits make clear that the Governor did not intend for the Board to use the same factors he had considered as bases for denying parole. Even though the Board did not have the benefit of the affidavits in rendering its decision, this Court does now. The affidavits conclusively resolve any ambiguities in the commutations. To ignore the Governor's expressed intent in this petition for an original remedial writ of habeas corpus would amount to a derogation of the Governor's constitutional authority to exercise grace under article IV, section 7. Governor Holden made his intent clear as to what the Board should do with respect to Lute and Branch in his affidavits.

With respect to Lute, Governor Holden further attested:

[H]aving determined that Shirley Lute's release would not depreciate the seriousness of her crime, and given that she also had an exit plan and an exemplary prison record, I believe the Parole Board exceeded its authority when it denied parole for Shirley Lute.

As such, this Court remands Lute to the Department of Corrections and orders the Board to promptly conduct a parole hearing to decide the conditions of her parole, but not to re-consider any of those factors attested to by the Governor in his affidavit.

With respect to Branch, Governor Holden stated in his affidavit that the "job of the Board of Probation and Parole in evaluating Lynda Branch's eligibility for parole post commutation [is] to examine her conduct in prison and determine her readi-

---

4. The Governor does not have the power himself to parole. Mo. Const. art. IV, sec. 7.

5. Governor Holden's affidavits are appropriate to use to discern the intent of his commutations because he was the sole author and only his intent is relevant. In contrast, for example, affidavits of legislators are not admissible to discern legislative intent because an affidavit from a legislator only reflects the intent of one legislator out of 197 that voted on a particular bill.

ness to re-enter society, and not to review the circumstances of her crime or her use of a weapon." As such, this Court remands custody of Branch to the Department of Corrections and orders the Board to promptly conduct a parole hearing for her in conformity with the Governor's stated intent in his affidavit with respect to whether she should be paroled.

In sum, the appropriate remedy at this point is not habeas corpus but mandamus.[6] This Court accordingly issues writs of mandamus ordering the Board to promptly conduct parole hearings for Lute and Branch in accordance with this opinion.

WOLFF, C.J., STITH, TEITELMAN and WHITE, JJ., concur.

PRICE, J., concurs in part and dissents in part in separate opinion filed.

LIMBAUGH, J., dissents in separate opinion filed.

WILLIAM RAY PRICE, JR., Judge, concurring in part and dissenting in part.

The Governor is granted the power of grace by article IV, section 7 of the Missouri Constitution. When exercised, this special power, by its very nature, deserves generous and not grudging respect.

I agree with the majority that the Governor's commutations of Ms. Lute and Ms. Branch necessarily include consideration and forgiveness of the seriousness of the two women's crimes, and, in Ms. Branch's case, the fact that she used a weapon and excessive force and violence. To read these two documents of commutation otherwise would render them for all practical purposes meaningless and useless. To the

extent that the Missouri Board of Probation and Parole refused parole to Ms. Lute and Ms. Branch for these reasons, they erred and infringed upon the power of the Governor. Consideration of the Governor's subsequent affidavit is unnecessary in this regard.

Article IV, section 7, however, does not include the power to parole. This power and the determination of conditions upon which parole may be granted are left exclusively to the Board of Probation and Parole. To the extent that the Governor's affidavit indicates his evaluation of specific factors of Ms. Lute's suitability for parole, it encroached upon the sole authority of the Board and should not be considered for that reason.

Accordingly, I concur with the majority that the Board of Probation and Parole should promptly conduct hearings for Ms. Lute and Ms. Branch giving full effect to the Governor's commutation. I would not, however, order more.

STEPHEN N. LIMBAUGH, JR., Judge, dissenting.

I respectfully dissent.

This case stands for the dubious and heretofore unheard of proposition that a person affected by the order of a former governor can successfully petition the courts to change the legal effect of that order on the ground that the governor now proclaims that he meant something different than what he said. I am afraid to speculate what other kinds of orders and pronouncements of a governor who has left

---

**6.** This Court issued writs of habeas corpus on November 21, 2007, which technically resulted in this Court taking custody of both women, though their physical custody remained in the Department of Corrections subject to this Court's authority. Having determined that a writ of mandamus is the proper remedy in both cases, this Court relinquishes its habeas corpus authority over the custody of the women so that the Board can promptly conduct parole hearings as required by the writs of mandamus.

office might also be subject to this precedent.

By their own limited terms, each of the orders in these cases provided only that, "This commutation eliminates from the sentence the prohibition against eligibility for parole for 50 years and makes [Lute and Branch] eligible for parole consideration." There is no ambiguity, patent or latent, the governor's intent is clear from the words he used, and there is simply no room for a contrary interpretation in logic or law. *See Six Flags Theme Parks, Inc. v. Dir. of Revenue*, 179 S.W.3d 266, 268 (Mo. banc 2005) and *Brownstein v. Rhomberg–Haglin & Assoc., Inc.*, 824 S.W.2d 13, 15 (Mo. banc 1992) (both holding where language is clear, unambiguous, and admits of only one meaning, there is no room for interpretation). This order does nothing more than make these women eligible for parole when they had been otherwise ineligible. Had the governor intended for these women to be released, he could have commuted the sentences to time served, but he did not do so. Instead, actual relief

for these women was dependent upon subsequent, discretionary action by the Missouri Board of Probation and Parole.[1]

Faced with the parole board's decision that release of these women would "depreciate the seriousness of the offense[s]," and with the tacit acknowledgment that the governor's order provided only that the women were merely eligible for parole, the majority attempts to cure the problem by stating: "While the commutations might not have explicitly stated that the Governor had considered 'the seriousness of the present offense,' that is necessarily implied because otherwise the Governor would not have recommended these two women for parole after considering the facts of their cases." The follow-up to this implication, as I understand it, is that the parole board is thus precluded from denying parole on the ground that it would depreciate the seriousness of the offense, because to deny parole on that ground is to "ignore the Governor's expressed intent [as set out in his affidavits] in derogation of the Gover-

---

1. Despite the horrific *allegations* of spousal abuse that the majority takes from the petitions, there is no record of the proceedings before the parole board and no record whether proof of these allegations was in any event submitted to the board.

Like my colleagues, I, too, am sympathetic with the plight of these two women, but the *allegations* as stated in the majority opinion present their cases as if there were a gross miscarriage of justice in the circumstances of their convictions and appeals. Lute was convicted of murder for hire, and she never contested the sufficiency of the evidence in her appeals, nor did she raise any issue about her inability to introduce evidence of spousal abuse. *State v. Lute*, 608 S.W.2d 381 (Mo. 1980); *State v. Lute*, 641 S.W.2d 80 (Mo. 1982). At trial, her defense was that she had no involvement whatsoever in the murder, so any evidence of spousal abuse, whether pursuant to a "battered spouse syndrome" defense or otherwise, was irrelevant. *See id.*

Branch, on the other hand, first claimed that the murder of her husband was commit-

ted by an intruder but later changed her story to claim that she and her husband had been arguing, that he had come at her with a gun, and that the gun had accidentally discharged. *State v. Branch*, 757 S.W.2d 595 (Mo.App. 1988). According to the transcript of the second trial, Branch was allowed to present *extensive* evidence of spousal abuse, including evidence of severe and repeated beatings, not only through her own testimony but through three independent witnesses, as well. She also called an expert witness who testified that she suffered from "battered spouse syndrome." The judge and jury took all of this testimony into consideration. Although the majority states that, "For unexplained reasons, [Branch's] lawyers in the second trial again did not introduce all of the evidence of the abuse," the record shows that the judge who heard her claims for post-conviction relief found that several of the witnesses were unable to be located after a diligent search by trial counsel's investigator and that such evidence they would have offered was nevertheless cumulative.

nor's constitutional authority to exercise grace . . ."

But, even if the governor necessarily factored in the degree to which his decision would depreciate the seriousness of the offenses, it does not follow that the parole board should be foreclosed from denying parole for that reason. The majority's position proceeds on the false premise that the power and operation of the parole board in granting and denying parole is somehow informed or dependent upon the governor's intent that the board can rely on certain considerations but not others. In fact, however, the governor's clemency powers are limited to reprieves, commutations and pardons, Mo. Const. art. IV, sec. 7, and the governor has no authority to dictate whether or under what circumstances the parole board may exercise its independent statutory functions. Indeed, Article IV, sec. 7, expressly delinks the respective functions of the governor and parole board by providing that, "The power to pardon shall not include the power to parole." In addition, section 217.690, RSMo Supp.2006, delineates the separate function of the parole board by providing that, "When *in its opinion* there is a reasonable probability that an offender in a correctional center can be released without detriment to the community or to himself, the board *may in its discretion* release on parole such person except as otherwise prohibited by law." (Emphasis added). The parole function, then, is solely within the province of the parole board, and parole decisions are matters solely for the board's discretion.

In sum, these women are now eligible for parole, but they are not entitled to it. The parole decision should be left to the discretion of the parole board, and the seriousness of the offenses should still be a factor that may be considered. In defer-

ence to the parole board, and to the law, I would deny relief.