

# In the Missouri Court of Appeals
# Eastern District

## DIVISION ONE

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | No. ED103059 |
| | ) | |
| Respondent, | ) | Appeal from the Circuit Court |
| | ) | of the City of St. Louis |
| vs. | ) | 1322-CR01179 |
| | ) | |
| RALPH ALEXANDER, | ) | Honorable Jimmie M. Edwards |
| | ) | |
| Appellant. | ) | Filed: November 29, 2016 |

Ralph Alexander ("Defendant") appeals the judgment entered upon a jury verdict convicting him of one count of first-degree murder, one count of first-degree assault, two counts of armed criminal action, and two counts of unlawful use of a weapon. We affirm.

## I. BACKGROUND

### A. Evidence Presented at Defendant's Jury Trial

Viewed in the light most favorable to the verdict, the evidence presented at Defendant's jury trial revealed the following facts. During the early evening hours of April 5, 2012, James Goldsby was driving a Nissan Maxima that belonged to his girlfriend Erica Johnson, who was present in the car along with her uncle and cousin. Goldsby and the other passengers arrived at Johnson's aunt's house, which was located in the City of St. Louis on Aldine Avenue near Whittier Street. While the others went inside the house, Goldsby remained in the parked car in front of Johnson's aunt's house.

After some time passed and Johnson had not returned to the car, Goldsby called her so that the two could leave. Two men walked by the Maxima while Goldsby was on the phone. The men, whom Goldsby recognized as "Little Ralph" and "Boo Man," looked inside the car as they slowly walked by, then continued walking down the street and turned the corner. However, after just a few seconds, they came back around the corner and walked towards the Maxima, causing Goldsby to grow suspicious. Goldsby began to drive away, but because of how the car was parked, he had to drive towards the men. Then, Little Ralph and Boo Man reached into their jackets, pulled out guns, and began shooting. Goldsby was still on the phone with Johnson at that point, and told Johnson that Little Ralph and Boo Man were shooting at him. Goldsby saw both men holding guns, and both men were shooting. Further, Goldsby believed he heard six or seven shots fired rapidly, and Johnson also stated that she could hear the gunshots.

Goldsby drove past the shooters and continued until he saw two police officers, to whom he reported that Little Ralph and Boo Man had fired guns at him. Then, as Goldsby was talking with the officers, he heard more gunshots. Johnson also heard this second round of gunshots from her aunt's house, and recalled that there were "way more" shots fired than the first set of shots but were also in rapid succession.

Also on the evening of April 5, 2012, around 5:30 p.m., Tracy Jones picked up his fiancée, Sylvia Scott from work. Jones told Scott that he wanted to stop at a neighborhood hangout called "The Yard," located in the City of St. Louis behind an apartment building on Whittier Street between Aldine Avenue and Dr. Martin Luther King Drive. Jones parked Scott's Chevrolet Prizm on Whittier Street, and walked across the street to The Yard while Scott remained in the car. Jones then left The Yard for a moment but returned shortly thereafter.

Jermaine Ward, a friend of Jones, was at The Yard that evening, and heard gunshots coming from the direction of Aldine Avenue and Whittier Street. Ward saw two men firing

2

handguns at a car in front of Johnson's aunt's house. After Ward saw the car speed off, he watched the two men begin to walk away as they appeared to reload their guns.

Jones also heard the first set of gunshots and told Ward he was leaving to take Scott home. Ward watched Jones cross Whittier Street towards the Prizm. Ward then witnessed the same two men who had shot at the car on the corner of Aldine Avenue and Whittier Street run toward the Prizm, go directly to the driver-side door, and open fire on Jones. Ward saw both men shooting, and heard at least ten shots fired in rapid succession.

Scott, who had remained in the Prizm, ducked down in the car when she heard the first round of gunshots. Scott had worked in security and believed the shots were fired in rapid succession from an automatic weapon. After the shooting stopped, Scott looked around and could see Jones walking towards the car. Jones then opened the door and asked Scott if she was ready to go, to which she agreed. As Jones was getting in the vehicle, shooting began again and he dove into the car on top of Scott, who was shot in the leg. Once the shooting stopped, Ward watched the two gunmen walk away. Ward approached the Prizm and saw Jones slumped over on the passenger side with his arms and head hanging out of the passenger door and blood running from his head.

The officers who had interviewed Goldsby put out a radio broadcast identifying Little Ralph and Boo Man as suspects in a shooting. Officer Michael Missel heard the broadcast, and recognized the nicknames as belonging to Defendant and Dontrell Sanders, respectively. Officer Missel knew Defendant lived on Whittier Street near the scene of the shooting, and that Sanders lived on East Garfield near Whittier Street. Officer Missel went to Sanders' house, where he was told by Sanders' father that Sanders, but not Defendant, was in the house. Eventually, Sanders and his father came out of the house to be interviewed by homicide detectives. Shortly

3

thereafter, Officer Missel saw Defendant leave the house and walk towards Whittier Street; Officer Missel then detained Defendant.

Officers were given permission to search the portion of the house where Sanders lived. There, they found gun boxes for two Smith & Wesson pistols, a .40-caliber and nine-millimeter, and for one Glock .22-caliber pistol. Ammunition, including a box of .40-caliber ammunition and a nine-millimeter clip, was also found.

Goldsby later identified Defendant in photo arrays, physical lineups, and at trial as one of the assailants. He also identified Sanders in a lineup as the other shooter. Also at trial, Johnson testified that she knew who Little Ralph and Boo Man were, and she identified Defendant as Little Ralph.

Defendant did not testify or present any evidence.[1]

## B.    Relevant Procedural Posture

Based on the events which occurred on April 5, 2012, Defendant was charged with eight counts. Counts I, II, and V relate to Defendant's firing a gun at the Prizm and killing Jones, including charges of first-degree murder (Count I), armed criminal action (Count II), and unlawful use of a weapon (Count V). Counts III and IV relate to the shots aimed at the Prizm and hitting Scott, including charges of first-degree assault (Count III) and armed criminal action (Count IV). Finally, Counts VI – VIII relate to Defendant's firing a gun at Goldsby, including charges of first-degree assault (Count VI), armed criminal action (Count VII), and unlawful use of a weapon (Count VIII).

Defendant's jury trial commenced and in the State's opening statement, the prosecutor described how police found gun boxes and ammunition while searching Sanders' house.[2] After

---

[1] To avoid unnecessary repetition, additional facts will be set out in our analysis in Section II.B.3. below.
[2] Specific portions of the trial transcript will be set forth in relevant part in Section II.A.2. below.

4

noting that a box for a nine-millimeter Smith & Wesson handgun was found in Sanders' closet, the prosecutor told the jury that Defendant had previously been found in possession of the gun which belonged in that box, allegedly attempting to establish an additional connection between Defendant and Sanders. Following the State's opening statement, Defendant's counsel ("Defense Counsel") objected to the State's reference to the 2010 possession of the nine-millimeter handgun, as they argued it constituted improper prior bad act evidence. Although the trial court sustained the objection, the judge overruled Defense Counsel's request for a mistrial.

At the close of the State's evidence and at the close of all the evidence, Defense Counsel filed a motion for a judgment of acquittal, which was subsequently denied. The jury then found Defendant guilty of Counts I, II, and V – VIII; Defendant was acquitted as to Counts III and IV. Defendant filed a motion for judgment of acquittal, or alternatively, motion for new trial asserting, *inter alia*, the trial court erred in denying Defendant's motions for judgment of acquittal and the trial court erred in refusing to grant a mistrial after the State's opening statement. The trial court subsequently denied Defendant's post-trial motion.

The trial court entered a judgment in accordance with the jury's verdict, and sentenced Defendant as a prior offender to life imprisonment without parole as to Count I, life sentences each as to Counts II, V, and VII, and five years of imprisonment each for Counts VI and VIII, with all sentences to run concurrently except for Counts I and II, which were to run consecutively. Defendant appeals.

## II.    DISCUSSION

In Defendant's first point on appeal, he argues the trial court erred in refusing to grant a mistrial after the State's opening statement alluded to evidence that was later ruled inadmissible. In his second point on appeal, Defendant argues that the trial court erred in denying his motion for judgment of acquittal at the close of all the evidence because the evidence was insufficient to

5

support Defendant's convictions for first-degree murder and armed criminal action, Counts I and II. Finally, in his third and fourth points on appeal, Defendant argues the trial court erred in entering convictions and sentences for four of his counts as they allegedly violated the double jeopardy clause of the U.S. Constitution.

**A.      Whether the Trial Court Erred in Refusing to Grant a Mistrial Because of the State's Allegedly Improper Opening Statement**

In his first point on appeal, Defendant argues the trial court erred in refusing to grant a mistrial after the State's opening statement alluded to evidence that was later ruled inadmissible.

**1.      Standard of Review and General Law Relating to Defendant's Claim**

We initially note that the parties disagree as to whether Defendant properly preserved this claim for appeal. However, as we find that Defendant's claim fails under either abuse of discretion or plain error review, we analyze the issue as if it was preserved.[3]

The scope of opening statements is within the discretion of the trial court, and we review an objection to opening statements for abuse of discretion. *State v. Thompson*, 68 S.W.3d 393, 395 (Mo. banc 2002). An appellate court also reviews the denial of a request for a mistrial for abuse of discretion. *State v. Kelly*, 119 S.W.3d 587, 591 (Mo. App. E.D. 2003). An abuse of discretion occurs when the trial court's ruling "is clearly against the logic of the circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration." *State v. Fassero*, 256 S.W.3d 109, 115 (Mo. banc 2008) (quotations in original). A mistrial is a drastic remedy, and should only be granted in extraordinary circumstances. *Kelly*, 119 S.W.3d at 591.

---

[3] Immediately following the State's opening statement, Defense Counsel requested a conference at the bench and objected to the reference to Defendant's 2010 possession of the nine-millimeter Smith & Wesson. The trial court ruled that the evidence would not be admitted, but denied Defense Counsel's motion for mistrial based on the State's reference to the inadmissible evidence during their opening statement. On appeal, the State asserts that Defendant failed to preserve this claim of error because Defense Counsel objected after the State had completed its opening statement. For purposes of this appeal only, we will accept the objection as preserved.

The purpose of an opening statement is to describe to the jury the evidence that the party plans to introduce. *State v. McFadden*, 391 S.W.3d 408, 430 (Mo. banc 2013). Accordingly, opening statements are limited to factual statements that can be proven. *Thompson*, 68 S.W.3d at 394. It is not error for a prosecutor to refer to evidence in an opening statement, even if that evidence is later excluded, if the evidence mentioned is arguably admissible and the prosecutor acts in good faith – with reasonable grounds for believing he will be able to introduce such evidence. *McFadden*, 391 S.W.3d at 430; *State v. Debler*, 856 S.W.2d 641, 656 (Mo. banc 1993); *State v. Hodges*, 586 S.W.2d 420, 426 (Mo. App. E.D. 1979). In contrast, a prosecutor commits error if he acts in bad faith by deliberately promising proof of evidence which is altogether inadmissible. *State v. Turner*, 633 S.W.2d 421, 425 (Mo. App. W.D. 1982).

### 2. The Relevant Portions of the State's Opening Statement and Analysis of Defendant's Claim

During the State's opening statement, the prosecutor attempted to describe to the jury the significance of the two gun boxes found in the home of Defendant's accomplice, Dontrell Sanders. The prosecutor explained that the ballistics testing had established that the gun used in the shootings was a .40-caliber pistol, which matched one of the gun boxes and ammunition found in the closet. The prosecutor then turned to the nine-millimeter handgun, continuing as follows:

> In addition to that you are going to hear that not only does James Goldsby place these individuals, the defendant and [Sanders] together during the shooting, that we also have them found together in the same house immediately after the shooting. But that other – the 9-millimeter Smith & Wesson pistol box that was there, well, it has a serial number on it as well. And you will hear from a police officer that will tell you that in 2010 – in other words a year and a half, two years before this murder – he found the defendant, Ralph Alexander, in possession of that 9-millimeter Smith & Wesson pistol that came out of the box that's in the co-defendant's house; yet another tie between these two guys.

At the conclusion of the State's opening statement, Defense Counsel asked to approach the bench. The following transpired:

7

| | |
|---|---|
| [Defense Counsel]: | Judge, at this time I would object to the portion of [the State's] [ ] opening statement where he brought up – and it was my understanding I didn't think that this particular prior bad act would be brought up if I didn't open the door. Because there was a series of arrests that were made. |

…

| | |
|---|---|
| [Defense Counsel]: | But this prior arrest where Mr. Alexander is supposedly caught in possession of a weapon and that weapon just so happens to match the type of weapon that's found in a gun box, I mean, I didn't expect it, Your Honor. If I did, I would have had a motion in limine. It's an example of a prior bad act is generally inadmissible. |
| [The State]: | I didn't say he was under arrest. I simply said that he was found in possession of it. As far as I know, being in possession of a weapon is not a crime. |
| The Court: | I am going to sustain the objection with respect to this 2010 – I learned about it in the last trial. There was no – there was no objection. I'm going to keep the 2010 possession out. He was not – he was not charged and convicted. |
| [Defense Counsel]: | Yes, he was. |
| The Court: | He was charged and convicted? |
| [The State]: | Yes, he was. But I was careful to not introduce anything about it being a crime at all. Possession of a weapon is not a prior bad act and it is not a crime. |

…

| | |
|---|---|
| [The State]: | Your Honor, with regard to relevancy, I believe it goes to show a further connection between the defendant and [Sanders]. Since they are charged as accomplices here, I believed it would be relevant. |
| The Court: | I understood very clearly. The Court is going to sustain the objection with respect to the 2010 weapon and you will move forward. |
| [Defense Counsel]: | Judge, at this point, for purposes of appellate review, I will move for a mistrial. |
| The Court: | The objection and the request for a mistrial is denied in its entirety. |

Here, Defendant argues that the trial court erred in failing to declare a mistrial based on the State's reference to Defendant's prior possession of the nine-millimeter Smith & Wesson.

8

Defendant further contends that the evidence was "irrelevant, inadmissible, and highly prejudicial" and the prosecutor should have known it as such. Defendant also asserts that the prosecutor did not have a good faith basis for making the statement as there was no reasonable basis for believing the allegedly improper prior bad act evidence would be admitted. However, the prosecutor's statement was not in error as we find no evidence that the State acted in bad faith and without reasonable belief in referencing Defendant's connection to the nine-millimeter Smith & Wesson. *See McFadden*, 391 S.W.3d at 430; *Hodges*, 586 S.W.2d at 426. At the bench, the prosecutor explained that he intentionally did not mention Defendant's related criminal conviction, and was only trying to establish an additional link between Defendant and his accomplice. *See State v. Harris*, 477 S.W.3d 131, 143 (Mo. App. E.D. 2015) (prior bad act evidence is admissible if it has a legitimate tendency to establish the defendant's guilt of the crime charged). The prosecutor's statements show that he was not deliberately promising the introduction of inadmissible evidence, but was attempting to use the 2010 possession evidence in a way that it was arguably admissible. *See Debler*, 856 S.W.2d at 656; *Turner*, 633 S.W.2d at 425.

The trial judge's comments – indicating that the evidence was not objected to in a previous trial – further support the prosecutor's good faith belief that the evidence would have been admissible in Defendant's trial. *See McFadden*, 391 S.W.3d at 430 (where evidence referred to in the State's opening statement had been admitted in a previous trial, the prosecutor had a good faith belief that it would be admitted). In light of the sufficient evidence presented of Defendant's guilt, the State's vague reference to Defendant's prior possession of the Smith & Wesson without any suggestion that Defendant was charged or convicted with a crime is insufficient to warrant reversal. *See Harris*, 477 S.W.3d at 143.

9

Accordingly, we find that the trial court did not abuse its discretion in refusing to grant a mistrial after the State's opening statement alluded to evidence that was later ruled inadmissible. Point one is denied.

**B.      Whether there was Sufficient Evidence to Support Defendant's Conviction for First-Degree Murder under a Theory of Accomplice Liability**

In his second point on appeal, Defendant argues that the trial court erred in denying his motion for judgment of acquittal at the close of all the evidence because the evidence was insufficient to support Defendant's convictions for first-degree murder and armed criminal action, Counts I and II. Defendant specifically asserts there was insufficient evidence from which a reasonable juror could have found Defendant acted together with or aided his accomplice in shooting and killing Jones, or that Defendant deliberated in the killing.

**1.      Standard of Review**

Appellate review of a claim that there was insufficient evidence to support a criminal conviction is limited to a determination of "whether the [S]tate has introduced sufficient evidence from which a reasonable juror could have found each element of the crime beyond a reasonable doubt." *State v. Hosier*, 454 S.W.3d 883, 898 (Mo. banc 2015). In making that determination, great deference is given to the trier of fact, and an appellate court will not weigh the evidence anew. *State v. Nash*, 339 S.W.3d 500, 509 (Mo. banc 2011). Additionally, all evidence and inferences favorable to the State are accepted as true, and all contrary evidence and inferences are disregarded. *Id*.

The State may meet its burden of proof by presenting either direct or circumstantial evidence connecting the defendant to each element of the crime. *State v. Burns*, 444 S.W.3d 527, 529 (Mo. App. E.D. 2014). Furthermore, circumstantial evidence is given the same weight as direct evidence in considering whether there was sufficient evidence to support a conviction. *Id*. at 528-29.

10

**2.      General Law Relating to the State's Burden of Proof**

A person commits the crime of first-degree murder if "he knowingly causes the death of another person after deliberation upon the matter." Section 565.020.1 RSMo 2000.[4] "Deliberation" is defined as "cool reflection for any length of time no matter how brief[.]" Section 565.002(3). Further, deliberation may be inferred from the circumstances surrounding the crime, and such an inference is supported by a lack of concern for and a failure to attempt to aid the victim. *State v. Moore*, 949 S.W.2d 629, 631, 633 (Mo. App. W.D. 1997). In addition, an intent to kill may be inferred from the use of a deadly weapon on some vital part of the victim's body. *State v. O'Brien*, 857 S.W.2d 212, 218 (Mo. banc 1993).

Where, as in this case, a defendant is tried for first-degree murder under a theory of accomplice liability, it is not necessary for him to have personally performed each act constituting the elements of the crime. *State v. Ferguson*, 20 S.W.3d 485, 497 (Mo. banc 2000). Nevertheless, in order to be responsible for another person's acts, a defendant must have acted together with or aided the other person either before or during the commission of the murder with the purpose of promoting the crime. *Id*. In addition, the State must prove that the defendant personally deliberated upon the murder. *Id*. Consistent with those principles, the Missouri Supreme Court has held the State makes a submissible case of first-degree murder under a theory of accomplice liability if it introduces evidence from which a reasonable juror could have concluded beyond a reasonable doubt that, (1) the defendant committed acts which aided another in killing the victim; (2) it was the defendant's conscious purpose in committing those acts that the victim be killed; and (3) the defendant committed the acts after he personally deliberated on the victim's death. *O'Brien*, 857 S.W.2d at 216-18.

---

[4] Unless otherwise indicated, all further statutory references are to RSMo 2000.

11

### 3. The Relevant Evidence Adduced at Trial and Analysis of Defendant's Claim

In this case, Goldsby testified that he immediately recognized the two men walking by his car, and knew them from the neighborhood as Little Ralph and Boo Man. During and within a short time after the first shooting, Goldsby told Johnson and reported to nearby officers that Little Ralph and Boo Man had shot at him. Additionally, Goldsby identified Defendant in photo arrays, physical lineups, and at trial as one of the assailants, and identified Sanders in a lineup as the other shooter. At trial, Goldsby reiterated that he saw both men holding guns, and saw both men shooting. Johnson also testified at trial that she knew who Little Ralph and Boo Man were, and she identified Defendant as Little Ralph.

Further, Ward, who was at The Yard that evening, heard the gunshots coming from the direction of Aldine Avenue and Whittier Street. Ward saw two men firing handguns at a car in front of Johnson's aunt's house, and could see flashes from the guns. He saw the two men begin to walk away for approximately seven or eight yards, appearing to reload their guns, and then turn around to walk in the direction of The Yard. Ward testified that he witnessed the same two men who had shot at the car on the corner of Aldine Avenue and Whittier Street run toward the Prizm as Jones was getting into it, go directly towards the driver-side door, and open fire on Jones. Ward saw both men shooting, and heard at least ten shots fired in rapid succession. Once the shooting stopped, Ward watched the two gunmen walk away. He then approached the Prizm and saw Jones slumped over on the passenger side with his arms and head hanging out of the passenger door and blood running from his head.

After the first shooting, police officers put out a radio broadcast identifying Little Ralph and Boo Man as suspects in a shooting, which was heard by Officer Michael Missel who recognized the nicknames as belonging to Defendant and Sanders, respectively. Officer Missel knew Defendant lived on Whittier Street near the scene of the shooting, and that Sanders lived

12

on East Garfield near Whittier Street. Officer Missel went to Sanders' house, and there he encountered Sanders and later Defendant. Upon searching Sanders' home, officers found gun boxes for two Smith & Wesson pistols, a .40-caliber and nine-millimeter, and for one Glock .22-caliber pistol. The box for the .40-caliber pistol contained a sealed cartridge casing from the manufacturer testing of the weapon. Ammunition, including a box of .40-caliber ammunition and a nine-millimeter clip, was also found.

Viewing the preceding evidence and all inferences therefrom in the light most favorable to the State, which our standard of review requires us to do, a reasonable juror could have found that Defendant acted with his accomplice in shooting and killing Jones, and that Defendant personally deliberated upon the killing. *See Hosier*, 454 S.W.3d at 898; *Nash*, 339 S.W.3d at 509. As previously indicated, Goldsby testified that Little Ralph (Defendant) and Boo Man (Sanders) were the men who shot at him. In addition, Ward testified he saw two men shoot at a car in the area where Goldsby testified he was located, then saw the men walk away, reload their guns, and run over to The Yard near where Jones was located and shoot. A reasonable juror could infer from the preceding testimony that Defendant acted with Sanders in shooting and killing Jones.

Moreover, a reasonable juror could have found that Defendant personally deliberated upon Jones' death, as there was sufficient evidence that, (1) Defendant and his accomplice both shot at Jones causing his death, which was supported by Ward's eyewitness testimony that the two gunmen were both shooting; (2) Defendant's conscious purpose was to kill Jones as evidenced by the two gunmen's actions in shooting directly at Jones multiple times in rapid succession; and (3) Defendant personally deliberated, as he had time to coolly reflect upon Jones' death while he walked away from the area near The Yard, reloaded his weapon, ran back towards The Yard to where Jones was located, and fired multiple shots at Jones. *See Ferguson*,

13

20 S.W.3d at 497; *O'Brien*, 857 S.W.2d at 216-18; section 565.002(3); *see also Moore*, 949 S.W.2d at 632 (finding that shooting a victim more than once indicates there was time for deliberation between shots). An inference of Defendant's deliberation is further reinforced by the use of a deadly weapon to Jones' head, and by the fact that Defendant and his accomplice "just walked away" from The Yard after the shooting. *See O'Brien*, 857 S.W.2d at 218; *Moore*, 949 S.W.2d at 633.

Defendant's argument on this point focuses on inconsistencies in the description of clothing worn by the assailants and emphasizes that the ballistics evidence suggests only one gun was used in the shootings. However, as the evidence relied on by Defendant is contrary to the judgment and unfavorable to the State, we must disregard it pursuant to our standard of review. *See Nash*, 339 S.W.3d at 509. In addition, the testimony of only one witness may be sufficient to sustain a conviction, even if the testimony is inconsistent. *State v. Nelson*, 818 S.W.2d 285, 288 (Mo. App. E.D. 1991) (citing *State v. Newberry*, 605 S.W.2d 117, 121 (Mo. 1980)). The jury's verdict indicates it found Ward's and Goldsby's testimony credible, and we will defer to that determination. *See Nash*, 339 S.W.3d at 509.

Finally, in regards to the armed criminal action charge (Count II), "section 571.015.1 provides that any person who commits any felony under the laws of this state by, with, or through the use, assistance, or aid of a dangerous instrument or deadly weapon is also guilty of the crime of armed criminal action…." *State v. Agee*, 350 S.W.3d 83, 90 (Mo. App. S.D. 2011) (quoting section 571.015.1) (internal quotations omitted). Because there was ample evidence that Defendant and/or Sanders shot a firearm directly at Jones several times in rapid succession resulting in Jones' death, the charge for armed criminal action based on Defendant's participation in the killing is supported by sufficient evidence. *See id.*

14

Accordingly, we find that there was sufficient evidence to support Defendant's convictions for first-degree murder and armed criminal action predicated on the murder. Based on the foregoing, the trial court did not err in denying Defendant's motion for judgment of acquittal at the close of all the evidence. Point two is denied.

**C.    Whether Defendant's Convictions and Sentences Violated the Double Jeopardy Clause of the U.S. Constitution**

In his final two points on appeal, Defendant argues the trial court erred in entering convictions and sentences for four of his counts as they allegedly violated the double jeopardy clause of the U.S. Constitution.[5]  Specifically, in Defendant's third point, he argues that his convictions and sentences for Counts I and V, respectively first-degree murder and unlawful use of a weapon, violated double jeopardy because both crimes sought to punish him for the same conduct: shooting and killing Jones.  Further, in his fourth point, Defendant asserts that his convictions and sentences for Counts VI and VIII, first-degree assault and unlawful use of a weapon, also violated double jeopardy because both crimes sought to punish him for the same conduct: shooting at Goldsby.

**1.    Standard of Review**

Defendant asks this Court to grant plain error review over his claims related to double jeopardy.  Plain error review is appropriate here because the Defendant failed to assert his constitutional challenges during his trial or at sentencing. *See State v. Horton*, 325 S.W.3d 474, 477 (Mo. App. E.D. 2010).  Where an appellant fails to preserve a constitutional claim, this

---

[5] Defendant's third and fourth points relied on also state that his rights were violated under the due process clause and right to a fair trial of the U.S. Constitution and under Article I, sections 10 and 18(a) of the Missouri Constitution.  However, the argument portion of his brief does not rely on these respective rights and focuses solely on double jeopardy under the U.S. Constitution.  Therefore, our analysis will focus only on double jeopardy. *See State v. Reynolds*, No. ED102951, 2016 WL 5030365, at *3 n. 4 (Mo. App. E.D. Sept. 20, 2016) (case mandated on Nov. 18, 2016).  Further, Defendant does not argue that his convictions and sentences violate the double jeopardy provision of the Missouri Constitution, presumably because such provision only protects against a retrial after an acquittal, and thus does not apply to this case. *See State v. Walker*, 352 S.W.3d 385, 387 n. 1 (Mo. App. E.D. 2011) (citing Mo. Const. art. 1, sec. 19).

15

Court may still hear such a claim pursuant to Rule 30.20.[6] *In Interest of J.T.*, 447 S.W.3d 212, 215 (Mo. App. E.D. 2014). Rule 30.20 grants this Court authority to consider "plain errors" by a trial court affecting a party's substantial rights. *J.T.*, 447 S.W.3d at 215.

Under plain error review, we will only grant a defendant relief if we find an error occurred, which affected his rights so substantially that a manifest injustice or miscarriage of justice resulted. *State v. McKay*, 411 S.W.3d 295, 304 (Mo. App. E.D. 2013). Plain errors are those which are evident, obvious, and clear, and our Court determines whether such errors exist based on the circumstances of each case. *Id*. at 304-05. The defendant has the burden of demonstrating a manifest injustice or miscarriage of justice resulted from the alleged error. *Id*. at 304. Whether a defendant's right to be free from double jeopardy has been violated is a question of law, which we review de novo. *Horton*, 325 S.W.3d at 477.

### 2. General Law Relating to Defendant's Claim

The double jeopardy clause of the Fifth Amendment of the U.S. Constitution includes two basic guarantees, "it protects defendants from successive prosecutions for the same offense after acquittal or conviction and it protects defendants against multiple punishments for the same offense." *State v. Porter*, 464 S.W.3d 250, 255 (Mo. App. E.D. 2015) (quoting *State v. Hardin*, 429 S.W.3d 417, 421 (Mo. banc 2014)).[7] However, in Missouri, double jeopardy does not automatically preclude prosecution for multiple offenses arising out of the same conduct. *State v. Walker*, 352 S.W.3d 385, 387 (Mo. App. E.D. 2011). Because Missouri follows the separate offense rule, a defendant may be charged with and convicted of multiple offenses arising from the same incident or conduct without violating double jeopardy if the legislature intended to punish the conduct under more than one statute. *Id*.

---

[6] All further references to Rules are to Missouri Supreme Court Rules (2016).

[7] The Fifth Amendment of the U.S. Constitution is made applicable to the states through the Fourteenth Amendment. *Walker*, 352 S.W.3d at 387 n. 1.

Here, Defendant argues that his right to be free from double jeopardy has been violated based on his multiple punishments; thus, the question before us is whether cumulative punishments were intended by the legislature. *State v. Liberty*, 370 S.W.3d 537, 546-47 (Mo. banc 2012); *Porter*, 464 S.W.3d at 255; *Walker*, 352 S.W.3d at 388; *Horton*, 325 S.W.3d at 478. In determining the legislature's intent, we first look to the statutes under which the defendant was charged and convicted. *Porter*, 464 S.W.3d at 255. But where, as here, the separate statutes prohibiting the same conduct are silent regarding whether cumulative punishment is authorized, we are guided by section 556.041, the general cumulative punishment statute. *Id.*; *Walker*, 352 S.W.3d at 388-89; *Horton*, 325 S.W.3d at 478; *see* section 565.020; section 565.050; section 571.030 RSMo Supp. 2012.[8]

Section 556.041 provides in relevant part that cumulative punishments are permitted unless one offense is designed to prohibit a kind of conduct generally and the other is to prohibit a specific instance of such conduct. Section 556.041(3).[9] "Where the elements of two offenses are separate and distinct, neither offense is a specific instance of the other and section 556.041(3) does not preclude convictions for both offenses." *Porter*, 464 S.W.3d at 256. Thus, to determine whether multiple charges constitute the same offense, this Court considers whether each offense requires proof of a fact that the other does not. *Bates v. State*, 421 S.W.3d 547, 551 (Mo. App. E.D. 2014); *see also Liberty*, 370 S.W.3d at 546; *State v. Burns*, 877 S.W.2d 111, 112 (Mo. banc 1994) (citing *Blockburger v. U.S.*, 284 U.S. 299 (1932)) (section 556.041 codified the "same-

---

[8] All further references to section 571.030 are to RSMo Supp. 2012, which incorporates legislative amendments through 2011 and was the version in effect at the time the events giving rise to Defendant's charges occurred. Any amendments made to section 571.030 which went into effect after April 5, 2012 are not relevant to this appeal.

[9] Section 556.041 expresses the Missouri legislature's general intent regarding cumulative punishments, permitting prosecution of multiple offenses for the same conduct with four exceptions. *Walker*, 352 S.W.3d at 388-89. Because Defendant only asserts that the exception set forth in section 556.041(3) applies to his convictions and sentences, that is the only exception we will discuss.

element" test adopted by the U.S. Supreme Court to determine whether multiple charges constitute the same offense).[10]

### 3. Analysis as to Counts I and V

In Count I, the indictment charged Defendant with first-degree murder under section 565.020, alleging that Defendant acted with his accomplice and knowingly, after deliberation, caused the death of Jones by shooting him. The indictment also charged Defendant in Count V with unlawful use of a weapon under section 571.030.1(9), stating that Defendant, along with his accomplice, knowingly discharged a firearm at a motor vehicle and Jones died as a result. Defendant contends that his convictions and sentences upon these two charges violated double jeopardy, as both cover the same conduct – Defendant's firing a gun into the Chevrolet Prizm at Jones.

Each of the two offenses involved in this point has an element different from the other, and thus, they are separate offenses. *See Bates*, 421 S.W.3d at 551. "The crime of first degree murder consists of three elements: (1) knowingly (2) causing the death of another person (3) after deliberation upon the matter." *State v. Tisius*, 92 S.W.3d 751, 764 (Mo. banc 2002). "[Section 571.030.1(9)] makes it unlawful to knowingly discharge or shoot a firearm [at or from] a motor vehicle." *Yates v. State*, 158 S.W.3d 798, 801 (Mo. App. E.D. 2005). A review of the statutes shows that there are elements required for one offense that need not be proven for the other: only first-degree murder necessitates proof of deliberation and causing the death of another person, while only unlawful use of a weapon requires the discharging of a firearm into a motor vehicle. Thus, the two offenses have elements that are separate and distinct, and cannot be

---

[10] Although Defendant concedes that his argument is contrary to Missouri Supreme Court precedent, he asserts that a defendant should be able to "prove the elements of two offenses are the same when the same conduct at issue shows it would be impossible to commit one charged offense … without committing the second charged offense…." However, we are constitutionally bound to follow controlling decisions of the Missouri Supreme Court. *Jones v. Galaxy 1 Marketing, Inc.*, 478 S.W.3d 556, 574 (Mo. App. E.D. 2015).

18

said to be a specific instance of the other. *See Porter*, 464 S.W.3d at 256. Furthermore, first-degree murder is not a specific instance of unlawful use of a weapon because first-degree murder requires a particular mental element – deliberation – that unlawful use of a weapon does not. *See id.* Therefore, there is no double jeopardy violation. *Id.* at 255-57.

Based on the foregoing, the trial court did not plainly err in entering convictions and sentences for both first-degree murder (Count I) and unlawful use of a weapon (Count V). Point three is denied.

### 4. Analysis as to Counts VI and VIII

The indictment also charged Defendant with first-degree assault under section 565.050 in Count VI, alleging that Defendant shot at Goldsby, and such conduct was a substantial step toward the commission of the crime of attempting to kill or cause serious physical injury to Goldsby, and such conduct was done with the purpose of committing assault. In Count VIII, the indictment further charged Defendant with unlawful use of a weapon under section 571.030.1(9), stating that Defendant, along with his accomplice, knowingly discharged a firearm at a motor vehicle, specifically, the Nissan Maxima (the vehicle driven by Goldsby). Regarding Counts VI and VIII, Defendant argues that his convictions and sentences violated double jeopardy, as they both cover the same conduct – Defendant's firing a gun into the Nissan Maxima at Goldsby.

"A person commits the crime of assault in the first degree if he attempts to kill or knowingly causes or attempts to cause serious physical injury to another person." Section 565.050.1. "[Section 571.030.1(9)] makes it unlawful to knowingly discharge or shoot a firearm [at or from] a motor vehicle." *Yates*, 158 S.W.3d at 801.

In *Bates*, this Court discussed a similar challenge to convictions for first-degree assault and unlawful use of a weapon based on the defendant's action of shooting a firearm into a hotel window. 421 S.W.3d at 551. The Court determined that "one statute requires proof that the shot

19

was fired at a dwelling house and the other requires proof that the shot was fired in attempt to injure another person." *Id*. Thus, we held that because the two offenses involved each had an element different from the other, they were separate offenses. *See id*.

Similarly with respect to Defendant's convictions, one statute requires proof of an attempt to kill or cause serious physical injury to another, and the other requires proof that a shot was fired at a motor vehicle. *See id*.; *Yates*, 158 S.W.3d at 802 (citing *Blockburger*, 284 U.S. at 304). Because each statute requires proof of a fact that the other does not, the statutes have separate and distinct elements and cannot be said to be a specific instance of the other. *See Porter*, 464 S.W.3d at 256; *Bates*, 421 S.W.3d at 551. Therefore, no double jeopardy violation has occurred. *See Porter*, 464 S.W.3d at 255-57; *Bates*, 421 S.W.3d at 551.

In support of his argument that his convictions and sentences for first-degree assault and unlawful use of a weapon violated his right to be free from double jeopardy, Defendant relies on *State v. Sloan*, 786 S.W.2d 919 (Mo. App. W.D. 1990). In *Sloan*, the State conceded that "based on the facts of the instant case" there was a double jeopardy violation arising from the defendant's conviction of both first-degree assault and unlawful use of a weapon, and the Court did not complete a *Blockburger* analysis. *Id*. at 923. Under those circumstances, Defendant's reliance on *Sloan* is misplaced. *See Bates*, 421 S.W.3d at 552 (similarly finding).

Based on the foregoing, the trial court did not plainly err in entering convictions and sentences for both first-degree assault (Count VI) and unlawful use of a weapon (Count VIII). Point four is denied.

20

### III.  CONCLUSION

The trial court's judgment is affirmed.

_____
ROBERT M. CLAYTON III, Presiding Judge

Mary K. Hoff, J., and
Lisa P. Page, J., concur.