

# IN THE MISSOURI COURT OF APPEALS
# WESTERN DISTRICT

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | |
| | ) | |
| Respondent, | ) | |
| | ) | WD86367 |
| v. | ) | |
| | ) | OPINION FILED: |
| | ) | April 8, 2025 |
| VONTEZ G. HOWARD, | ) | |
| | ) | |
| Appellant. | ) | |

### Appeal from the Circuit Court of Jackson County, Missouri
### The Honorable Jerri J. Zhang, Judge

### Before Division Two:  Janet Sutton, Presiding Judge, and
### Mark D. Pfeiffer and Gary D. Witt, Judges

Mr. Vontez Howard ("Howard") appeals from the judgment of the Circuit Court

of Jackson County, Missouri ("trial court"), following a jury trial, which convicted him of

two counts of murder in the second degree, one count of armed robbery in the first

degree, one count of unlawful use of a weapon under section 571.030.1(9), and four

counts of armed criminal action.  On appeal, Howard principally challenges the

sufficiency of the evidence supporting his convictions and also asserts two challenges

seeking plain-error review of his claims of erroneous sentencing and double-jeopardy

challenges.  We affirm.

**Factual and Procedural History[1]**

Shortly before 5:00 p.m., on March 1, 2021, several home surveillance systems and witnesses observed an SUV chase a sedan, occupied by Victim 1[2] and Victim 2, through a neighborhood in northeast Kansas City. At 4:53 p.m., the sedan crashed into a tree. Two black men exited the SUV and approached the sedan before successfully opening the sedan's doors and briefly engaging both victims. Despite the struggle, the sedan managed to reverse away from the tree and quickly accelerated down the wrong way of a one-way street. The SUV pursued. At 4:58 p.m., several shots were fired from the SUV, leaving both victims in the sedan with fatal gunshot wounds. The shots killed Victim 2, the driver, nearly instantly and caused the sedan to crash into a tree and then burst into flames. Victim 1 quickly succumbed to the combination of the fire, his gunshot wounds, and his injuries from the crashes. When processing the scene, investigators could not locate Victim 1's phone.

Police identified the SUV involved in the chase and found it registered to Howard's girlfriend. She testified that she had only one key for the SUV and that she allowed Howard to drive the SUV; her testimony regarding Howard's access to the SUV was corroborated by the testimony of an officer that responded to an accident from days

---

[1] "On appeal from a jury-tried case, we view the facts in the light most favorable to the jury's verdict." *State v. Rouner*, 679 S.W.3d 141, 143 n.1 (Mo. App. W.D. 2023) (quoting *State v. Demark*, 581 S.W.3d 69, 73 n.2 (Mo. App. W.D. 2019)).

[2] Pursuant to the directive of section 509.520.1(4)-(5) (Supp. IV 2024), we do not use any victim or witness names in this opinion, other than parties to the underlying litigation. All other statutory references are to THE REVISED STATUTES OF MISSOURI (2016), as supplemented through March 1, 2021, unless otherwise indicated.

*before* the shooting in which Howard was driving the SUV[3] and surveillance footage showing Howard driving the SUV days *after* the shooting. Police later found surveillance video showing the same SUV[4] picking up Perpetrator, an associate of Howard's at 4:28 p.m. on March 1st—roughly half an hour before the shooting. However, no witnesses could identify the SUV's driver from the video.

Police then reviewed cellular tower data for the phone numbers associated with Howard, Perpetrator, and Victim 1. The data revealed that Victim 1 called Perpetrator from Shawnee, Kansas, at 4:10 p.m. on March 1st and that Perpetrator's phone received the call at his residence in south Kansas City, Missouri. Immediately after this call ended, Perpetrator called Howard. The cell towers pinged by this call were consistent with Perpetrator calling from his residence and Howard's phone receiving the call at his girlfriend's residence, several miles south of Perpetrator. Perpetrator called Howard again at 4:27 p.m. For this call, Perpetrator's phone pinged off the cell tower next to his residence, just as before, but Howard's phone had traveled several miles north and now pinged off the tower[5] closest to Perpetrator's residence—consistent with the surveillance footage showing the SUV arriving to pick up Perpetrator at 4:28 p.m.

Victim 1 called Perpetrator again at 4:52 p.m. The cell towers pinged by this call showed that both Victim 1 and Perpetrator were now within a few miles of each other in

---

[3] Howard's girlfriend was not at the scene of this earlier accident.

[4] Howard's girlfriend confirmed that the SUV shown in the surveillance footage from around the crime scene was hers.

[5] Howard and Perpetrator relied on different network providers for their phone service, so their phones did not ping the same towers. At 4:27 p.m., their phones pinged the towers closest to Perpetrator's residence for each respective service provider.

northeast Kansas City, near the eventual site of the shooting. Immediately after the shooting, from 4:59-5:05 p.m., the phones of Howard and Perpetrator collectively pinged cell towers five separate times in a pathway consistent with moving west, then south in the direction of an interstate highway. Within that span of time, their phones moved approximately three miles from the crime scene.

At 5:21 p.m., Howard's phone pinged a cell tower at a location in Kansas along the same interstate path. Howard's phone pinged three additional times over the next fourteen minutes in a manner consistent with the phone staying within an overlapping area between two cell towers. At 5:56 p.m., Perpetrator's phone pinged a third tower in a manner consistent with Perpetrator's and Howard's phones staying together in the same area as Howard's earlier pings.

At 6:08 p.m., *Victim 1's* phone pinged along a highway just south of the overlapping area where Howard's and Perpetrator's phones had been for the previous thirty minutes. The phone pinged again three minutes later in a manner consistent with it being initially driven south from the previous ping towards the interstate highway and then northeast along that interstate towards downtown Kansas City. At 6:25 p.m., Howard's phone pinged near downtown Kansas City along the path of the same interstate. Then at 6:45 p.m., Howard's phone pinged the cell tower closest to his girlfriend's house—the same cell tower that Howard's phone pinged when it received the first call from Perpetrator's phone.

Howard was charged with two counts of murder in the first degree, one count of robbery in the first degree, one count of unlawful use of a weapon under section

4

571.030.1(9), and four counts of armed criminal action.  The State presented the above evidence at trial.  Howard then rested without presenting any evidence.  The jury found Howard guilty as charged on all counts except for the two first-degree murder charges; on both of those charges, the jury instead found Howard guilty of the lesser-included offense of second-degree murder.  Howard was sentenced to the following terms of imprisonment:  twenty-five years on both of the second-degree-murder convictions, fifteen years on the first-degree-armed-robbery conviction, ten years on the unlawful-use-of-a-weapon conviction, and ten years on each of the four armed-criminal-action convictions.  We discuss the manner in which these sentences run in relation to one another in our analysis of Howard's twelfth point on appeal.

Howard's motions for judgment of acquittal and for new trial—first at the end of the State's evidence and then after the jury's verdict—were denied.  Howard timely appealed, raising twelve points on appeal.  In his first ten points, Howard challenges the sufficiency of the evidence supporting his convictions.  In his final two points, Howard requests plain-error review.  For ease of analysis, we group many of Howard's points together.

**Standard of Review for Points I-X**

Our review of a challenge to the sufficiency of the evidence to support a conviction is limited to "whether the State has introduced sufficient evidence from which a reasonable juror could have found each element of the crime beyond a reasonable doubt."  *State v. Studdard*, 688 S.W.3d 788, 795 (Mo. App. S.D. 2024) (quoting *State v. Ajak*, 543 S.W.3d 43, 46 (Mo. banc 2018)).  "When judging the sufficiency of the

5

evidence to support a conviction, appellate courts do not weigh the evidence but accept as true all evidence tending to prove guilt together with all reasonable inferences that support the verdict and ignore all contrary evidence and inferences." *State v. Collins*, 648 S.W.3d 711, 718 (Mo. banc 2022) (quoting *State v. Wooden*, 388 S.W.3d 522, 527 (Mo. banc 2013)). "Reasonable inferences can be drawn from both direct and circumstantial evidence, and circumstantial evidence alone can be sufficient to support a conviction." *State v. Peeler*, 603 S.W.3d 917, 920 (Mo. App. E.D. 2020) (quoting *State v. Brown*, 360 S.W.3d 919, 922 (Mo. App. W.D. 2012)). Nonetheless, we "may not supply missing evidence, or give the [State] the benefit of unreasonable, speculative or forced inferences." *State v. Gilmore*, 537 S.W.3d 342, 344-45 (Mo. banc 2018) (alteration in original) (quoting *State v. Whalen*, 49 S.W.3d 181, 184 (Mo. banc 2001)).

### Analysis of Points I-VIII

In Points I-VIII, Howard challenges the sufficiency of the evidence to support each of his eight convictions, arguing that the State's evidence would not allow a reasonable juror to conclude beyond a reasonable doubt that he was the person who drove the SUV to pick up Perpetrator and subsequently acted in concert with Perpetrator. We disagree.

Howard concedes the evidence at trial was sufficient to establish that: Perpetrator and at least one other person, a black male, chased Victims' sedan before killing Victims by shooting them from an SUV; Howard is a black male; Howard's girlfriend owned the SUV involved in the shooting; the SUV picked up Perpetrator at 4:28 p.m. on the day of the shooting; Howard had access to the only key to the SUV; Howard had driven the

6

SUV multiple times before the shooting, including to pick up Perpetrator at his residence; Perpetrator's phone called Howard's phone at 4:12 p.m. and 4:27 p.m. on the day of the shooting; and cell tower data placed Howard's phone near the site of the shooting around the time of the shooting. Howard asserts that this is the full extent of the evidence supporting his involvement.

But, his recitation of the incriminating evidence is incomplete and omits the following additional evidence: the cell tower data for the 4:12 p.m. ping showed that Howard's phone was at his girlfriend's residence; *after* Perpetrator's phone made the 4:12 p.m. call to Howard's phone, Howard's phone moved several miles north to Perpetrator's residence, where he received a second call from Perpetrator at 4:27 p.m.; the movement of Howard's phone matched surveillance video showing the SUV belonging to Howard's girlfriend picking up Perpetrator at his residence at 4:28 p.m.

From this evidence, a reasonable juror could infer that: (1) Perpetrator called Howard with a request for a ride and (2) Howard then drove the SUV to pick up Perpetrator. These two inferences are both further corroborated by the subsequent cell tower data from Perpetrator's, Howard's, and Victim 1's phones. Before the pickup at 4:28 p.m., Howard's phone moved towards Perpetrator's phone while Perpetrator's phone *remained stationary*. After the SUV picked up Perpetrator at 4:28 p.m., however, Perpetrator's and Howard's phones began moving *together* as if they were riding together in the same vehicle—first towards the crime scene before the shooting, then away from the crime scene after the shooting, and then finally to Kansas.

In fact, the State provided sufficient evidence for a reasonable juror to conclude that Howard was likely the only person who could have driven the SUV. Howard's girlfriend provided uncontradicted testimony that she had only one key to the SUV and that Howard had access to that key. Howard concedes on appeal that the State's evidence demonstrated a black *man* approached the Victims' sedan with Perpetrator at the crime scene, eliminating Howard's girlfriend as that accomplice. Thus, if Howard were not the person driving the SUV, either his girlfriend gave the key to another person to drive it, or another person drove it without her permission or knowledge. But, neither of these two explanations would account for Howard's phone moving to Perpetrator's residence, then to the crime scene, then to Kansas, and finally back to his girlfriend's residence—unless the person driving the SUV was also in possession of Howard's phone. Furthermore, a reasonable juror could infer that Howard's phone was not simply left in the SUV to passively travel with whomever happened to be driving—Howard's phone made four *outgoing* phone calls between 4:27 p.m., the first time it pinged away from his girlfriend's residence and 6:45 p.m., the time it returned to the residence.

Taken together, all of this evidence would have allowed a reasonable juror to infer that Howard was the person aiding Perpetrator on March 1st.

Nonetheless, Howard cites several cases where the evidence supporting a conviction was found to be insufficient and attempts to analogize these facts to those cases.

These cases stand for the general proposition that evidence of proximity to a crime, alone, is insufficient to establish guilt. *State v. Smith*, 355 S.W.3d 560, 562 (Mo.

8

App. E.D. 2011) ("While the State proved beyond a reasonable doubt that some person committed a first-degree burglary of the victim's home, the State failed to prove beyond a reasonable doubt that the defendant was that person. The conviction rests on the coincidence of the victim seeing the defendant walking through her yard, someone breaking into her home, and the defendant's presence some two blocks away shortly thereafter."); *State v. Dixson*, 546 S.W.3d 615, 621 (Mo. App. E.D. 2018) ("As such, all of the inferences on which this conviction relies are founded in his presence and not any other evidence of affirmative participation. These are precisely the inferences our courts prohibit: simply because a person is present, even under highly suspicious circumstances and where a crime has clearly occurred or is occurring, does not without more give rise to an inference that the person participated in the crime."); *State v. Withrow*, 8 S.W.3d 75, 81 (Mo. banc 1999) ("Even viewed in the deferential light owed a jury verdict, the evidence does not support a conclusion that defendant had constructive possession over the bedroom, the closet, or their contents. No evidence demonstrated he lived at the house. Nothing beyond being present in the room truly connects defendant to the manufacturing apparatus or the jar in the closet.").

These cases are all readily distinguishable because in each cited case, the State presented no further evidence, circumstantial or otherwise, that the defendant engaged in the proximate illegal activity. Here in contrast, the State does not rely solely on the presence of Howard's phone being near the scene of the shooting at the time of the shooting to prove his guilt. Rather, the combination of the evidence establishing Howard's connection to the vehicle involved in the crimes; the cell tower data showing

9

Howard's association with Perpetrator, before, during, and after the shooting; surveillance footage showing the SUV picking up Perpetrator; and eye-witness testimony that the driver of the SUV chased the Victims' sedan before they were shot—provided strong evidence that Howard actively participated in the crimes as the driver of the SUV who chased the Victims' sedan and ultimately facilitated their murders.[6]

Points I-VIII are denied.

**Analysis of Points IX-X**

In Points IX and X, Howard challenges the sufficiency of the evidence to support his armed-robbery conviction and the corresponding armed-criminal-action conviction, arguing that the State's evidence would not allow a reasonable juror to find beyond a reasonable doubt that Howard took possession of Victim 1's phone. Howard raises two separate theories to advance his points. First, Howard argues the State failed to provide evidence that Victim 1 was in possession of his phone at the time of the shooting and, thus, that Howard could not have taken the phone from Victim 1. Second, Howard contends that, even if the State successfully proved Victim 1 possessed his phone on the day of the shooting, the State nonetheless failed to prove that Howard and Perpetrator took it.

Regarding Howard's first theory, the evidence showed that: (1) at 4:10 p.m. on the day of the shooting, a phone with a number registered to Victim 1 made a call from

---

[6] Howard further argues that his girlfriend's testimony that he had access to the SUV and that he had driven it a few days before the shooting was insufficient to supply the inference that he drove the SUV on the day of the shooting. As detailed above, the State relied on considerably more evidence than this testimony to prove that Howard was the driver of the SUV at the time of the shooting.

Lenexa, Kansas—several miles away from either Perpetrator or Howard and (2) minutes before the shooting, at 4:52 p.m., the same phone was in use and had moved near the scene of the shooting, matching surveillance footage showing Victim 2's sedan in the same area. Given that the phone corresponding to the number registered to Victim 1 was used to make outgoing calls at both times and had moved to the scene of the crime consistently with video of Victim 1 in the same area at the same time, a reasonable juror could conclude beyond a reasonable doubt that Victim 1 had and was using his phone in the sedan before the shooting.

Regarding Howard's second theory, the evidence showed that: (1) Victim 1 possessed his phone in the sedan before the shooting; (2) Victim 1's phone was never recovered from the scene of the sedan's final crash; (3) after Victim 1 was killed in the shooting, cell tower data showed that his phone moved several miles away from the scene to Kansas City, Kansas. From this evidence, a reasonable juror could have concluded beyond a reasonable doubt that someone took Victim 1's phone after the sedan crashed and then drove away with it. Furthermore, after the shooting, the phones of Victim 1, Perpetrator, and Howard all pinged cell towers in a manner that was consistent with Perpetrator and Howard driving while in possession of Victim 1's phone. Thus, a reasonable juror could have concluded beyond a reasonable doubt that Howard and Perpetrator, acting in concert, were the ones who took Victim 1's phone from the sedan's wreckage.

Points IX and X are denied.

11

**Standard of Review for Points XI-XII**

Howard concedes that he failed to raise his objections in Point XI and XII before the trial court. Thus, he failed to properly preserve either point for appeal. *State v. Minor*, 648 S.W.3d 721, 729 (Mo. banc 2022) ("Only an objection made timely *at trial* will preserve an issue for appeal."). However, we may still exercise our discretion to review his points for plain error. Rule 30.20.[7] To establish plain error, Howard must demonstrate "the claimed error facially establishes substantial grounds for believing that manifest injustice or miscarriage of justice has resulted." *State v. Onyejiaka*, 671 S.W.3d 796, 798 (Mo. banc 2023) (quoting *State v. Brandolese*, 601 S.W.3d 519, 526 (Mo. banc 2020)).

**Analysis of Point XI**

In Point XI, Howard requests plain-error review of his argument that his convictions for second-degree murder and for unlawful use of a weapon under section 571.030.1(9) violate Missouri's double-jeopardy statute. We find no error, plain or otherwise.

"The double jeopardy clause protects against multiple 'prosecutions for the same offense after either an acquittal or a conviction' as well as 'multiple punishments for the same offense.'" *Id.* (quoting *State v. Daws*, 311 S.W.3d 806, 808 (Mo. banc 2010)). However, "a defendant may be convicted in one proceeding of more than one offense based upon the same conduct if the legislature intends to punish the conduct under more than one statute." *Id.* (quoting *State v. Villa-Perez*, 835 S.W.2d 897, 903 (Mo. banc

---

[7] All rule references are to I MISSOURI COURT RULES - STATE 2024.

12

1992)).  The Missouri legislature has expressed its general intent that punishment of the same conduct should be cumulative where the conduct violates more than one statute—unless one of the exceptions of section 556.041 applies.  *Id.* at 799 & n.3.

Here, Howard contends his convictions for second-degree murder and for unlawful use of a weapon under section 571.030.1(9) meet the exception in section 556.041(3),[8] which reads:  "[t]he offenses differ only in that one is defined to prohibit a designated kind of conduct generally and the other to prohibit a specific instance of such conduct."

"Where the *elements* of two offenses are separate and distinct, neither offense is a specific instance of the other and section 556.041(3) does not preclude convictions for both offenses."  *State v. Porter*, 464 S.W.3d 250, 256 (Mo. App. E.D. 2015) (emphasis added) (citing *State v. Hill*, 970 S.W.2d 868, 871 (Mo. App. W.D. 1998)).  "Thus, to determine whether multiple charges constitute the same offense, this Court considers whether each offense requires proof of a fact that the other does not."  *State v. Alexander*, 505 S.W.3d 384, 397-98 (Mo. App. E.D. 2016) (citing *Bates v. State*, 421 S.W.3d 547, 551 (Mo. App. E.D. 2014)).

Second-degree murder and unlawful use of a weapon under section 571.030.1(9) do not trigger section 556.041(3)'s exception to cumulative punishment for the same conduct.  Section 571.030.1(9) requires the defendant to discharge a firearm but does not require the defendant to cause the death of another.  § 571.030.1(9) ("A person commits

---

[8] Howard does not raise any of the three other exceptions provided under section 556.041(1)-(4).

13

the offense of unlawful use of weapons, . . . if he or she knowingly: Discharges or shoots a firearm at or from a motor vehicle, . . . , discharges or shoots a firearm at any person, or at any other motor vehicle, or at any building or habitable structure, unless the person was lawfully acting in self-defense[.]"). Second-degree murder, meanwhile, requires the defendant to cause the death of another but does not require the defendant to discharge a firearm. § 565.021. Thus, both offenses have an element that is distinct from the other. *See Alexander*, 505 S.W.3d at 398 (citing *Porter*, 464 S.W.3d at 256) ("A review of the statutes shows that there are elements required for one offense that need not be proven for the other: only first-degree murder necessitates . . . causing the death of another person, while only unlawful use of a weapon requires the discharging of a firearm into a motor vehicle. Thus, the two offenses have elements that are separate and distinct, and cannot be said to be a specific instance of the other.").

Nonetheless, Howard argues that double jeopardy under section 556.041(3) should be analyzed not only under the elements of each offense but also under the *specific facts* of the case. Under this theory, Howard asserts that, because his unlawful use of a weapon resulted in the deaths of Victim 1 and Victim 2, his murder convictions are simply specific instances of his general conduct of unlawfully using of a weapon. Howard cites only one case that has accepted this approach—*State v. Dailey*, 708 S.W.2d 220 (Mo. App. S.D. 1986). We recently considered this same argument and joined the Eastern District of this Court in rejecting *Dailey*:

> Royal cites only one case to support her argument and that case has since been rejected by other Missouri courts. *See State v. Dailey*, 708 S.W.2d 220 (Mo. App. S.D. 1986). In *Dailey*, the court, in a break with all other

14

Missouri courts that have addressed the issue, declined "to enunciate double jeopardy principles in disposing of" Dailey's arguments, which were based on Section 556.041(3). *Id*. at 221-22. Instead, the court determined that Dailey's convictions for both unlawful sale of a security and stealing by deceit violated Section 556.041(3) because the same facts were used to support both convictions. *Id*. at 222. The court's approach in *Dailey* was summarily rejected in [*State v. Pilousek*, 747 S.W.2d 766, 769-70 (Mo. App. E.D. 1988)] and has not been utilized by any Missouri court since.

*State v. Royal*, 703 S.W.3d 650, 666 (Mo. App. W.D. 2024), *transfer denied*, No. SC100885 (Mo. Jan. 28, 2025). We again join the rest of Missouri's courts in declining to follow *Dailey*.

Point XI is denied.

## Analysis of Point XII

In Point XII, Howard requests plain-error review of his assertion that both the oral and written pronouncements of his sentence are ambiguous and that he therefore requires remand for resentencing.

"In general, where an oral pronouncement of a defendant's sentence is materially different than the written sentence, the oral pronouncement controls if it is unambiguous." *State v. Wolford*, 590 S.W.3d 324, 330 (Mo. App. E.D. 2019) (citing *Johnson v. State*, 446 S.W.3d 274, 276 (Mo. App. E.D. 2014); *Robinson v. State*, 540 S.W.3d 445, 448 (Mo. App. E.D. 2018)). "Where the oral pronouncement is ambiguous or silent on a particular issue, we examine the entire record to determine if the oral sentence can be unambiguously ascertained." *Id.* (citing *State v. Lazar*, 182 S.W.3d 578, 579-80 (Mo. App. E.D. 2005)).

We find that no manifest injustice has occurred because the trial court's oral pronouncement is unambiguous and, therefore, controls Howard's sentence. The trial court issued Howard's sentence in the following oral pronouncement:

> It is the judgment and sentence of this Court that the defendant is committed to the Missouri Department of Corrections for a period of 25 years in Count I, 10 years in Count II, 25 years in Count III, 10 years in Count IV, 15 years in Count V, 10 years in Count VI, 10 years in Count VII, and 10 years in Count VIII.

> The Court further orders that the sentences in Counts I and III run consecutive to each other and concurrent with Counts V and VII. The Court further finds that Counts II, IV, VI, and VIII are to run concurrent with each other and consecutive with their [predicate] felonies in Counts I, III, V and VII.

Howard concedes this pronouncement unambiguously runs Counts I and III consecutively, resulting in a total sentence of at least fifty years' imprisonment. However, Howard asserts that the portion of the oral pronouncement regarding the concurrent armed-criminal-action sentences (Counts II, IV, VI, and VIII) could be interpreted in two ways: (1) the sentences begin running simultaneously at the time the sentence for the first predicate crime completes—after the ten-year sentence for Count VII; or (2) the sentences begin running simultaneously following the completion of the sentences for every predicate crime—after the consecutive twenty-five-year sentences for Counts I and III.

The first interpretation is mistaken. If Count IV were to run concurrently beginning at the end of the sentence for Count VII (or Count I or Count VI), the ten-year sentence for Count IV would end *before* the end of the twenty-five-year sentence for Count III—resulting in Count IV running *concurrently* to Count III, not *consecutively* as

16

the oral pronouncement provides.  The only way for the armed-criminal-action sentences to run both *concurrently* with each other and also *consecutively* to each predicate conviction is if all four sentences run concurrently after the end of the longest total sentence for the predicate crimes—after the completion of the consecutive twenty-five-year sentences for Counts I and III.

And if any doubt remained on this interpretation of the oral pronouncement, the written pronouncement of Howard's sentence further clarifies that each of the armed-criminal-action sentences run consecutively to Count III:  "Counts 1 and 3 shall run consecutively and run concurrent with counts 5 and 7.  *Counts 2, 4, 6, and 8* shall run concurrent and *run consecutively with counts* 1, *3*, 5 and 7."  (Emphasis added.)

Because the oral pronouncement is unambiguous and requires Count IV to run consecutively to Count III, the total length of Howard's term of imprisonment must be sixty years, not fifty.

Point XII is denied.

### Conclusion

The judgment of the trial court is affirmed.

_____
Mark D. Pfeiffer, Judge

Janet Sutton, Presiding Judge, and Gary D. Witt, Judge, concur.